UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHELE PISTELLO,

                              Plaintiff,

        -against-                                        5:16-CV-0212 (LEK/ATB)

THE BOARD OF EDUCATION OF THE
CANASTOTA CENTRAL SCHOOL
DISTRICT,

                              Defendant.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        This case involves a dispute between the Canastota School District and Michele Pistello,

a former teacher and employee at the Canastota High School, relating to events that led up to the

her resignation. Dkt. No. 1 ("Complaint") ¶ 9. After making complaints to members of the

administration, filing a sexual harassment report, and being transferred to the district's middle

school, Pistello resigned from her teaching position. Id. ¶ 45. Pistello then brought suit against

the School District alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-3; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203; Section

504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. § 794a; the Equal Protection Clause;

and New York Education Law section 3028-d. Presently before the Court is the School District's

Motion for Judgment on the Pleadings. Dkt. No. 12 ("Motion for Judgement on the Pleadings").

For the reasons stated below, the motion is granted in part and denied in part.

## II.    BACKGROUND

### A.   Factual History

Pistello began teaching English for special education students at the Canastota Central School District in 2010. Compl. ¶ 9. Until her resignation, Pistello enjoyed positive performance reviews and helped her students achieve successful outcomes on the New York State Regents Exam. Id.

#### 1.   E-mail Exchange

On November 6, 2014, Pistello sent an e-mail to June Clarke, the Canastota School District Superintendent. Id. ¶ 23. The e-mail discussed the district's failure to address scheduling issues that were affecting the special education students in Pistello's class. Id. In the e-mail, Pistello assessed the possible ramifications:

> [I]n my 15-1 self contained English 11 class, I have three students who leave for BOCES [a career skills program] after only ten minutes of classtime. This happens daily. I don't see how anyone could expect these students to pass any Regents successfully since they are NEVER in class for an entire period. On each student's IEP [Individual Education Plan], it states that the student is scheduled for a 41 minute English class. This indicates that we—as a district—are not in compliance. If these students fail—as they all are now failing—their parents could sue the school district.

Dkt. No. 1-3 ("Exhibit C") at 1–2. Pistello also informed Superintendent Clarke of her frustration with the situation and suggested that the scheduling issue was "a direct attack on [her] to sully [her] reputation." Id.

Clarke responded the next day, reassuring Pistello that the students' schedules would be fixed and inviting her to a meeting on November 13, 2015, with Clarke and Carolyn Rose, the Director of Special Education. Id. at 1. Rose reached out to Pistello on December 18, 2014, via e-

2

mail. Dkt. No. 1-4 ("Exhibit D"). Rose's e-mail discussed Pistello's alleged failure to raise the scheduling issues with Rose as well as problems regarding attempts to set up a time for classroom observations. Id. at 1. Rose directed Pistello to bring any IEP or special education issues to her attention and ended by stating, "If my directive is not followed, I will have no other recourse but to pursue formal administrative action." Id. The following day, Pistello responded by staying that she was "disturbed" that Rose would threaten her and attempt to paint her in a negative light. Id. at 2.

### 2. Annual Professional Performance Review ("APPR")

Pistello was informed that Rose would be conducting Pistello's APPR.[1] Compl. ¶ 33. Pistello objected to her appointment; however, Rose conducted the APPR. Id. ¶ 35. Although Pistello had used the same lesson in previous evaluations and received high scores, she was unsatisfied by Rose's evaluations. Id. ¶ 36. After Rose's APPR was made available, Pistello—through her attorney—challenged the review, citing numerous inaccuracies as well as abnormally low scores. Id. ¶ 37–38. This challenge was successful, and the School District changed the review to classify Pistello as "Highly Effective." Id. ¶ 38.

### 3. Regents Examination Grading

Pistello had previously graded and conducted review classes for the New York State English Regents Examination, which is administered in January. Id. ¶ 27. But Pistello was not asked by the administration to grade the January 2015 Regents Exam. Id. ¶ 28. Pistello sought an

---

[1] An APPR appears to be a report on a teacher's abilities as determined by the reviewing party for that year. Pistello does not expand on the potential impact of a negative APPR on a teacher's career.

explanation from Assistant Principal Christopher Rogers, who "belittled her for making inquiries" and did not give a reason for leaving Pistello out of the exam grading. Id.

### 4. Notices

On January 26, 2015, Pistello received a notice requiring her to attend a meeting to discuss her allegedly unprofessional and inappropriate behavior. Id. ¶ 29. She received a similar notice on February 25. Id. Pistello characterizes these notices as "letters of reprimand." Dkt. No. 14 ("Plaintiff's Memorandum") at 12. There are no facts alleged to suggest these letters held weight other than to request Pistello's presence at these meetings. After seeking the aid of an attorney, these "letters of reprimand" were ultimately removed from Pistello's personnel file.[2] Id. The Complaint does not discuss what happened at these meetings.

In addition to the notice issued to Pistello on February 25, the administration sent her a memorandum that Pistello characterizes as "disciplinary in nature." Compl. ¶ 31. Pistello states that she was required to work through her attorney to change its language, but that the memo, which still contains inaccurate statements, remains in her personnel file. Id. ¶ 32; Pl.'s Mem. at 12–13.

### 5. Meetings with Rogers and the Sexual Harassment Report

On February 4, 2015, Pistello gave a student, D.J., detention for acting inappropriately in her classroom and for skipping a previously assigned detention. Compl. ¶ 12. Later that day, Pistello was informed that D.J. had told a female student that Pistello could "suck [his] d..." and that he would not comply with her detention. Id. Pistello filed a disciplinary incident report and,

---

[2] Pistello simply claims that the attorney requested the letters be removed. Pl.'s Mem. at 12. She provided no further information on the attorney's actions subsequent to removal.

accompanied by another employee, sought out Rogers to discuss the incident. Id. ¶ 13; Dkt. No. 1-1 ("Exhibit A") ¶ 28.

During the meeting, Rogers suggested that the school set up another meeting with Pistello, the school guidance counselor, himself, and D.J. Ex. A, Ex., at 4. Although Pistello did not want to attend, Rogers insisted. Id. Prior to this meeting, Pistello once again punished D.J. for an unrelated incident. Id. This prompted Rogers to call Pistello into his office. Id.

During this second meeting,[3] Rogers shouted and acted in a hostile manner. Compl. ¶ 13. Rogers, in response to the sexual comment made by D.J., said to Pistello: "Like no one has ever said that to you before." Id. ¶ 15. Pistello responded that no one ever had, to which Rogers replied "Oh, come on—I find that hard to believe that has never been said to you before."Id. ¶ 15; Ex. A, Ex., at 3. Judy Balducci—Pistello's mother, who was also an employee of the school district—overheard the altercation through Rogers's partially closed office door. Ex. A, Ex., at 3.

Pistello filed a sexual harassment report with the school district on February 27, 2015, concerning Rogers's statements during the second meeting. Dkt. No. 1-2 ("Exhibit B") at 1–2. Jason Mitchell, the school district's compliance officer, found the statements "inappropriate," but stated that they did not constitute sexual harassment. Compl. ¶ 18. Pistello appealed Mitchell's decision and the school board affirmed Mitchell's findings. Id. ¶ 19.

---

[3] The Complaint is unclear as to whether there was one or two meetings. The Complaint itself seems to imply that all of the events surrounding D.J.'s actions took place in one meeting with Rogers. Compl. ¶¶ 13–15. Pistello's Exhibit A, however, contains information suggesting that two separate meetings took place: a first meeting to discuss D.J.'s rude in-class behavior (witnessed by Stacey Stagnitti, another teacher at the school) and a second meeting to discuss D.J.'s sexually explicit comments (partially witnessed by Balducci). Ex. A, Ex., at 1–4.

### 6. Targeting Pistello's Son

Finally, Mitchell took Pistello's son into Rogers's office and "questioned" him about his interactions with a female student over Snapchat. Id. ¶¶ 42–43. Pistello claims her son does not have a Snapchat, and that the interaction between her son and Mitchell was pretext for getting back at Pistello. Id. ¶¶ 43–44.

### 7. Middle School Transfer and Resignation

On June 12, 2015, Pistello learned that she was being transferred to the School District's middle school, where she would teach math and reading. Id. ¶ 39. After Pistello raised the objection that she was not certified to teach either middle school math or reading, the district informed her on July 16, 2015, that the teaching assignment would be limited to middle school reading. Id. ¶ 40. Her new classroom was "not set-up and . . . a mess," and was located across the hallway from Rose. Id. ¶ 41.

In August 2015, Pistello resigned from her position with the Canastota School District and took a new job in the Syracuse City School District. Id. ¶ 45.

## B. Pistello's Complaint

Pistello asserts that the acts described above, including Rogers's comments, the two notices, the disciplinary memorandum, the assignment of Rose to conduct Pistello's APPR, not being asked to grade the Regents Exam, Mitchell's meeting with Pistello's son, and, ultimately, the transfer to the middle school, created a hostile work environment because of her gender in violation of Title VII and the Equal Protection Clause. Id. ¶¶ 70–72, 83–84. Pistello also claims those same acts violated Title VII because they were taken in retaliation for her filing the sexual harassment report. Id. ¶¶ 76–79.

Pistello also claims that her advocacy on behalf of her students with IEPs affords her protection under the ADA and RA. Id. ¶ 61. She alleges that, because of her advocacy, she suffered both a retaliatory hostile work environment and per se adverse employment actions. Id. ¶¶ 47–50, 56–59.

Finally, Pistello asserts that she is protected by a whistleblower provision in the New York Education Law for suggesting that the failure to follow IEPs could open up the School District to future lawsuits. Id. ¶¶ 88–91.

## C. School District's Motion for Judgment on the Pleadings

After answering the Complaint, the School District moved for judgment on the pleadings seeking to dismiss all Pistello's claims under Federal Rule of Civil Procedure 12(c). Dkt. No. 12-1 ("Defendant's Memorandum"). The School District asserts that none of the actions it took, including Rogers's comments, displayed sex-based animus. Id. at 4. Additionally, the School District claims that Pistello has failed to demonstrate the existence of an adverse employment action or that her work environment was objectively and subjectively hostile under Title VII. Id. at 4. The School District requests dismissal of Pistello's Equal Protection claim for a failure to meet the Monell standard. Id. at 19.

The School District also applies its Title VII analysis to Pistello's ADA and RA claims, though it adds that Pistello's allegedly protected activity under the ADA and RA—advocacy on behalf of her IEP students—was in fact designed to protect her reputation as a teacher. Id. at 15.

Finally, the School District requests that Pistello's New York Education Law section 3028-d claim be dismissed because none of the activities that Pistello identified constitute "financial practices." Id. at 22.

### III.    LEGAL STANDARD

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001). To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

**IV.    DISCUSSION**

**A.  Title VII**

*1.  Discriminatory Hostile Work Environment*

Title VII prohibits "an employer . . . [from] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The sine qua non of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be because of sex.'" <u>Patane v. Clark</u>, 508 F.3d 106, 112 (2d Cir. 2007) (per curiam) (quoting <u>Leibovitz v. N.Y.C. Transit Auth.</u>, 252 F.3d 179, 189 (2d Cir. 2001)). The plaintiff "need only give plausible support to a minimal inference of discriminatory motivation." <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 311 (2d Cir. 2015) (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002)).

A hostile work environment under Title VII involves a "workplace . . . permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 21 (1993) (citation omitted) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65, 67 (1986)). In order to state a Title VII hostile work environment claim, a plaintiff must establish that: (1) the conduct creates an environment that is objectively severe or pervasive, (2) the conduct was subjectively perceived as hostile and abusive, and (3) the creation of this environment was based on the plaintiff's gender. <u>Patane</u>, 508 F.3d at 113.

When evaluating whether a the conduct of an employer was objectively severe or pervasive, courts employ a "totality of the circumstances" approach. <u>Hayut v. State Univ. of</u>

N.Y., 352 F.3d 733, 745 (2d Cir. 2003) (citing Harris, 510 U.S. at 23). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). Typically, single incidents are not severe or pervasive, but a single act can be severe if it completely "transform[] the plaintiff's workplace." Id.; see also Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (holding that the use of sexually charged language to berate a junior female lieutenant in front of an audience of her subordinates met the single-act exception).

The Supreme Court has provided the following factors to guide this inquiry: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance . . . [and its] effect on the employee's psychological well-being." Harris, 510 U.S. at 23. The totality-of-the-circumstances approach is similarly applied when analyzing the subjectively-hostile-and-abusive prong. Id.

Finally, "[i]n order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." Alfano, 294 F.3d at 374. It is "axiomatic" that the conduct must relate to the plaintiff's sex in order to establish a Title VII claim. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). A court will not deem an act of harassment to be directed at the individual's gender if it "was grounded in workplace dynamics unrelated to her sex." Id. at 256.

Pistello has failed to establish that the abusive work environment she experienced was due her gender. Pistello provides two theories for linking the actions of the School District and

its employees—which she alleges created a hostile work environment—to her gender. Pl.'s Mem. at 6. First, the actions taken by Rogers and the School District throughout the 2014–2015 school year created a hostile work environment based on her gender. Id. Second, Rogers's behavior during the February 4 meeting was so egregious that, as a single incident, it transformed Pistello's workplace into a hostile environment. Id.

The Second Circuit has held that "incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination." Alfano, 294 F.3d at 375. But, efforts to link a few facially sex-based incidents to a larger group of sex-neutral incidents in order to establish the third prong of a hostile work environment claim have been met with enhanced scrutiny by the courts. See, e.g., Kaytor v. Elec. Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) ("Title VII 'does not set forth "a general civility code for the American workplace."'" (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006))).

In evaluating these situations, courts have concluded that even two or three facially sex-based events might be insufficient to impute a sex-based animus to facially sex-neutral incidents. See Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 319 (2d Cir. 1999) (holding that a generally rude atmosphere and abrasive interactions with plaintiff's boss, combined with "lewd" sex-based banter and posting pictures of nude men, did not imply a sex-based animus in the facially sex-neutral incidents); Cristofaro v. Lake Shore Cent. Sch. Dist., 473 F. App'x 28, 30 (2d Cir. 2012) (per curiam) (finding a sex-based bet and sex-based comments about Cristofaro's physical appearance, when combined with "mildly offensive conduct," did not establish that the hostile work environment was based on her sex). But cf. Raniola v. Bratton, 243 F.3d 610, 622 (2d Cir. 2001) (identifying four facially sex-based incidents and two facially sex-neutral incidents

and concluding that, "[w]ith this background, a factfinder could reasonably infer that the other adverse treatment described by Raniola was suffered on account of sex").

The difficulty in meeting the <u>Alfano</u> standard rises considerably when the plaintiff is alleging only one facially sex-based event. <u>See</u> <u>Miller v. Praxair, Inc.</u>, 408 F. App'x 408, 410–11 (2d Cir. 2010) (per curiam) (holding that "routine disagreements and mild criticisms," in conjunction with a single race-based incident, did not amount to a hostile work environment); <u>Dayes v. Pace Univ.</u>, 2 F. App'x 204, 206–07 (2d Cir. 2001) (per curiam) (finding that a supervisor commenting on the plaintiff's appearance, yelling at her, smirking at her, and making other sexual comments did not amount to a hostile work environment); <u>Bowman v. Granny's Kitchen, LLC</u>, No. 14-CV-585, 2015 WL 541276, at *3 (N.D.N.Y. Feb. 10, 2015) (granting a motion to dismiss on the grounds that one racial slur, even when combined with multiple instances of a boss yelling at the plaintiff, was insufficient to state a plausible claim for a hostile work environment).

Viewing the facts in the light most favorable to Pistello, she has pointed to only one facially sex-based event: comments Rogers made during the February 4 meeting. The remainder of the incidents are facially sex-neutral. The Court finds that this single event does not plausibly suggest that the other, sex-neutral events were motivated by gender. Pistello's first theory thus fails to establish a discriminatory hostile work environment.

Pistello's second theory rests on <u>Howley v. Town of Stratford</u>, 217 F.3d 141. There, a fellow lieutenant berated Howley—the fire department's only female—by referring to her menstrual cycle, calling her a "cunt" several times, and stating that she did not receive a promotion because she did not "suck cock good enough." <u>Id.</u> at 148. The incident itself took

place in front of several other department officers and a number of Howley's subordinates. Id. at 154. The court found that this single incident "intolerably altered Howley's work environment," in part because of the implication that Howley's deficiencies were sex-based diminished her respect among her peers and subordinates. Id. Courts will compare the Howley facts with those in the present case in order to determine Howley's applicability. See Alfano 294 F.3d at 374 ("[C]ourts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse."); Peterson v. Wash. Cty. Dep't of Pub. Works, No. 00-CV-1092, 2002 WL 32344505, at *4 (N.D.N.Y Dec. 19, 2002) (holding that Howley is distinguishable when there is no evidence that the alleged sexual harassment was done in front of other people or in a way that would create an animus or impair the plaintiff's ability to do her job).

Pistello experienced an off-handed insult that appeared to be sexual in nature. But, Rogers' statements ("like no one has ever said that to you before" and "Oh, come on–I find that hard to believe that has never been said to you before") fail to approach the crudity of the Howley statements. Further, Pistello alleged that only one witness—her mother—was present when Rogers made these sex-based statements. These facts are not nearly as severe as those in Howley.

Even assuming that Pistello subjectively perceived her work environment to be hostile, Pistello has failed to allege facts suggesting that her work environment was objectively hostile due to her gender. Accordingly, the Court grants the School District's motion to dismiss Pistello's Title VII discriminatory hostile work environment claim.

*2. Retaliation*

Retaliation under Title VII occurs when "an employer . . . discriminate[s] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 89–90 (2d Cir. 2015) (third alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). A violation occurs when there is an adverse action that "would not have occurred in the absence of the retaliatory motive." Zann Kwan v. Andalex Grp., LLC, 737 F.3d 834, 846 (2d Cir. 2013). "[F]or a retaliation claim to survive a motion for judgment on the pleadings . . . the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." Vega, 801 F.3d at 90 (quoting 42 U.S.C. § 2000e-3(a)).

Logic requires that any adverse action must occur after a plaintiff opposes an unlawful employment practice for it to constitute retaliation "because" of the plaintiff's opposition. E.g., Lawson v. City of New York, 595 F. App'x 89, 90 (2d Cir. 2015) (per curiam); Bryant v. Begin Manage Program, 281 F. Supp. 2d 561, 573 (E.D.N.Y. 2003). Therefore, the Court will look only to events that occurred after February 27, the day Pistello filed the sexual harassment report in this case, in evaluating her retaliation claim.[4]

"[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of

---

[4] The meeting notices (January 26 and February 25), the Regents grading (January), and the disciplinary memorandum (February 25), all occurred before Pistello filed the sexual harassment report. Compl. ¶¶ 28–29, 31.

discrimination.'" Vega, 801 F.3d at 90 (quoting Burlington, 548 U.S. at 57). An employee transfer can constitute an adverse employment action if "a reasonable employee would have found the challenged action materially adverse." Williams v. City of New York, No. 99-CV-2697, 2006 WL 2668211, at *21 (E.D.N.Y. Sept. 11, 2006) (quoting Burlington, 548 U.S. at 68).

Pistello asserts that she is not certified to teach the reading class to which she was transferred, let alone the math class that she successfully lobbied to have removed from her teaching docket. Pl.'s Mem. at 13. Transferring a teacher to teach a class for which she lacked certification is likely to guarantee her failure. Ragusa v. Malverne Union Free Sch. Dist. (Ragusa II), 381 F. App'x 85, 90 (2d Cir. 2010) (per curiam). An action designed to guarantee an employee's failure is certainly one that a reasonable employee would view as constituting a setback in an employee's career. Thus, the Court finds that Pistello's transfer to the middle school reading class constitutes an adverse employment action.

"As for causation, a plaintiff must plausibly plead a connection between the [retaliatory] act and his engagement in protected activity." Vega, 801 F.3d at 90. The Supreme Court has established a "but-for" standard for retaliation claims, stating that "[i]t is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." Id. at 90–91 (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)). The Second Circuit has elaborated on this pleading standard: "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Zann Kwan, 737 F.3d at 846.

Temporal proximity may support a finding of a retaliatory motive, but the amount of time between the protected activity and the adverse employment action must be "very close." Riddle v. Citigroup, 640 F. App'x 77, 79 (2d Cir. 2016) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). The Second Circuit has held that a time period of five months between the opposition and the adverse employment action is sufficiently close to imply a retaliatory intent. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

The School District informed Pistello of the impending transfer on June 12, less than five months after she filed her sexual harassment complaint. This time period is sufficiently short to infer a relationship in the context of a motion for judgment on the pleadings. Gorzynski, 596 F.3d at 110. The Court thus denies the School District's motion to dismiss the Title VII retaliation claim.

**B. ADA/Rehabilitation Act Retaliation**

The Americans with Disabilities Act and the Rehabilitation Act impose identical requirements for assessing retaliation claims and therefore can be evaluated simultaneously. Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999); accord Quadir v. N.Y.S. Dep't of Labor, No. 13-CV-3327, 2016 WL 3633406, at *2 (S.D.N.Y. June 29, 2016) (citing Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 167 (2d Cir. 1998)). The Second Circuit has held that "the framework used in analyzing retaliation claims under Title VII [should also be

used] in analyzing a claim of retaliation under the ADA." Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999).

### 1. Per Se Retaliation

Pistello can make out a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against the plaintiff; and (4) a causal connection exists between the alleged adverse action and the protected activity. Teglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). A plaintiff must simply have had a "good faith, reasonable belief" that the employer's actions violated the provisions of the ADA. Sarno, 183 F.3d at 159 (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

The Second Circuit's recent decision in B.C. v. Mt. Vernon City School District, 837 F.3d 152, 161 (2d Cir. 2016), raises the question of whether—as part of a well-pleaded complaint—a plaintiff must state facts to support that the plaintiff's advocacy was for students disabled under the IDEA *and* the ADA in order to establish that the plaintiff engaged in protected activity under the ADA. In ruling on the motion for summary judgement, the court stated,

> An IDEA disability is not equivalent to a disability as cognizable under the ADA and Section 504. Plaintiffs . . . cannot rely solely on "receipt of special education" to establish an ADA or Section 504

> disability. Those seeking relief pursuant to ADA or Section 504 must
> come forward with "additional evidence"—beyond simply their
> eligibility for IDEA coverage—showing their eligibility for the
> remedies afforded by the ADA and Section 504.

Id. (first quoting Ellenberg v. N.M. Military Inst., 572 F.3d 815, 819 (10th Cir. 2009); and then

quoting Rodriguez v. Vill. Green Realty, 788 F.3d 31, 45 (2d Cir. 2015)). The court concluded

that the plaintiff had not provided any evidence that the special education students were also

disabled under the ADA and therefore were ineligible for relief under the ADA or Section 504.

Id.

Under this Second Circuit precedent, simply showing the existence of an IDEA disability

(as indicated by the IEPs in this case) may not qualify an individual for protection under the

ADA unless the evidence demonstrates a concurrent ADA-qualified disability. The Second

Circuit has been silent as to the standard for pleading the existence of ADA disabilities when

advocating for the proper implementation of students' IEPs.[5]

Pistello asserts that the adverse employment actions following her e-mail to Clarke were

in retaliation for her advocacy on behalf of the students with IEPs in her class. Pl.'s Mem.

at 17–18. In response, the School District asserts that Pistello's advocacy for her IEP students

was merely pretext for her concern about her reputation and that none of the events following the

e-mail on November 6 were adverse employment actions. Def.'s Mem. at 15–18.

---

[5] Two district courts have held—at the motion to dismiss stage—that advocating for disabled students who are not receiving the accommodations prescribed by the IDEA constitutes protected activity under the ADA. Smith v. Pub. Schs., 133 F. Supp. 3d 289, 294 (D. Mass. 2015); DeCotiis v. Whittemore, 842 F. Supp. 2d 354, 369 (D. Me. 2012).

Relying on Eskenzai-McGibney v. Connetguot Central School District, 84 F. Supp. 3d 221 (E.D.N.Y. 2015), the School District states that the e-mail was simply an attempt to "protect her employment position."[6] Def.'s Mem. at 16. The School District asserts that Pistello has provided no information suggesting that she had a good faith belief that the School District was violating the ADA/RA. Id. at 17. Pistello claims that she is protected by the ADA because she was advocating on behalf of students who are disabled under the IDEA (as evidenced by their IEPs). Pl.'s Mem. at 15.

As the School District points out, some sections of the November 6 email discuss topics unrelated to IEPs. Nonetheless, Pistello did raise the IEP issue. Ex. C at 2. Pistello's e-mail to Clarke clearly states that she was concerned that the scheduling violated the student's IEPs, and in turn, might lead parents to sue the School District. Id. Thus, the Court finds that the Complaint sufficiently alleges that Pistello had a good faith, reasonable belief that her advocacy on behalf of the disabled students with IEPs concerned a violation of the ADA.

Furthermore, the School District does not argue that because IDEA disabilities do not qualify as ADA disabilities, Pistello did not engage in protected activity by advocating for them. In light of the failure of the School District to raise this issue, the Court declines to address it at the motion-to-dismiss stage.

"As to the second element, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have

---

[6] Eskenzai-McGibney is distinguishable. In Eskenzai-McGibney the advocacy on behalf of the disabled students was an effort to prevent bullying. 84 F. Supp. 3d at 232–33. In the present case, the advocacy was to enforce a specific right of the disabled students under their IEP. Ex. C at 1–2.

understood, that the plaintiff's opposition was directed at [prohibited] conduct . . . [under the ADA]." Galdieri-Ambrosini, 136 F.3d at 292; accord Eskenazi-McGibney, 84 F. Supp. 3d at 234 (citing Galdieri-Ambrosini, 136 F.3d at 292).

The day after Pistello sent the November 6 e-mail, Clarke informed Pistello that the IEP-related scheduling conflicts would be fixed and that they should set up a meeting to discuss the issue. Ex. C at 1. Shortly thereafter, Rose personally addressed Pistello's alleged failure to raise the IEP issues with Rose before Pistello brought them to Clarke. Ex. D. Therefore, the Court can infer that the School District was aware that Pistello was raising an issue relating to violations of students' IEPs.

The examples of events that qualify as adverse actions under Title VII also constitute adverse actions under the ADA. Compare Caskey v. County of Ontario, 560 F. App'x 57, 58 (2d Cir. 2014) (per curiam) (listing examples of ADA adverse actions), with Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (using identical examples of adverse actions in the Title VII context). As was previously noted in the Title VII retaliation analysis, Pistello's transfer from the high school to the middle school rises to the level of an adverse action.

The final requirement to state an ADA retaliation claim is that "[a plaintiff] must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." Treglia, 313 F.3d at 720. "[A] close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." Id. Again, time periods of five months between protected activity and the retaliation can meet this temporal requirement. Gorzynski, 596 F.3d at 110.

The Court acknowledges that most intraschool transfers are not made known to teachers until the latter part of the school year and do not take place until after the end of a school year. See Rodriguez, 620 F.2d at 364 (noting that the plaintiff was informed at the beginning of April that her transfer to teach elementary school art was to take effect after the end of the school year in June); Ragusa v. Malverne Union Free Sch. Dist. (Ragusa I), 582 F. Supp. 2d 326, 336 (E.D.N.Y. 2008) (stating that the plaintiff was informed at the end of March that her transfer to teach sixth grade classes was to take effect at the beginning of the following school year). The Court finds that the seven-month gap between the e-mails discussing IEPs and the notice of transfer is still close enough to plausibly infer a causal connection. The Court thus denies the School District's motion to dismiss the ADA per se retaliation claim.

### 2. Retaliatory Hostile Work Environment

ADA hostile work environment claims are evaluated under the same standard as Title VII. Zavala v. Cornell Univ., 9 F. Supp. 3d 213, 220 (N.D.N.Y. 2014) (Kahn, J.). Further, a "hostile work environment may constitute an adverse employment action in the context of a retaliation claim." Volpe v. N.Y.C. Dep't of Educ., 195 F. Supp. 3d 582, 595 (S.D.N.Y. 2016) (citing Thomas v. iStar, Inc., 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006)).

As discussed earlier, the Complaint sufficiently alleges that Pistello subjectively perceived the environment to be hostile, and Pistello's advocacy on behalf of her students places her within the ADA's protection. Pistello has also pleaded sufficient facts to allow for a plausible inference that the allegedly negative actions by the School District were taken in response to her advocacy on behalf of the students with IEPs. The sizeable number of negative events began a little over a month after the e-mail, and continued regularly until Pistello resigned. This very

close temporal proximity is sufficient to infer a causal connection between Pistello's November 6 e-mail and these negative events.

With that in mind, the conduct must also be objectively severe or pervasive. Viewing the facts in the light most favorable to Pistello, the negative acts began one month after Pistello's initial e-mail to Clarke with the threat of formal administrative action by Rose. Ex. D at 1. Following that, Pistello was subjected to multiple disciplinary hearings, not asked to grade the English Regents exam as she had in the past, had the same individual who "threatened" her with administrative action appointed to conduct her APPR observations, was scolded by Rogers for disciplining D.J., was the target of Rogers' sex-based comments, was forced to enlist the aid of an attorney to get evaluations and disciplinary memos corrected for accuracy, and was ultimately transferred to teach a class that she was not certified to teach (which amounts to an adverse employment action on its own). Compl. ¶¶ 13, 15, 25, 28–29, 31–33, 38, 40.

Taken as a whole, these events were objectively pervasive given their frequency and varying levels of allegedly negative impact on Pistello. Therefore, Pistello has pleaded sufficient facts to suggest that the allegedly negative actions by the School District were taken in response to Pistello's advocacy on behalf of the students with IEPs and created a hostile work environment. Accordingly, the Court denies the School District's motion to dismiss the ADA retaliatory hostile work environment claim.

## C. Fourteenth Amendment Claim

"Section 1983 provides a cause of action to a party who is deprived of 'any rights, privileges, or immunities secured by the Constitution and laws' of the United States by one who is acting under color of state law." Am. Auto. Mfrs. Ass'n v. Cahill, 53 F. Supp. 2d 174, 179

(N.D.N.Y. 1999) (Kahn, J.) (quoting 42 U.S.C. § 1983). In order to state a claim under 42 U.S.C. § 1983 against a municipality or one of its subordinates, a plaintiff must show an official policy or custom that causes the plaintiff to be subjected to a denial of a constitutional right. Monell v. Dep't of Soc. Serv., 436 U.S. 658, 694 (1978). "A school district's liability under Monell may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" Hurdle v. Bd. of Educ., 113 F. App'x 423, 424–25 (2d Cir. 2004) (per curiam) (quoting Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004)).

"[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Zerka v. City of New York, 459 F. App'x 10, 12 (2d Cir. 2012) (per curiam) (quoting Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)). A plaintiff must identify a "specific policy or custom as the source of the alleged constitutional violation[]." Martinez v. City of New York, 340 F. App'x 700, 702 (2d Cir. 2009) (per curiam) (citing Monell, 436 U.S. at 694–95). In bringing her equal protection claim, Pistello fails to point to any specific policy that the School District has adopted or custom it has endorsed.

Alternatively, Pistello asserts that Rogers, Rose, and Mitchell, as well as "other administrators" were the "chief executive authority in the District" and that they had final policymaking authority. Pl.'s Mem. at 22. The policymaking authority rests with the board of education for the school district, and to a lesser extent, with the district superintendent. N.Y. Educ. Law § 1709, 1711(2)(a); Hurdle, 113 F. App'x at 426 ("[D]elegating the final decision to

the superintendent in the cases of contested individual employee transfers did not elevate him to the status of policymaker, much less final policymaker, in that regard."); Jones v. Bay Shore Union Free Sch. Dist., 170 F. Supp. 3d 420, 439 (E.D.N.Y. 2016) ("While a Superintendent may be a decision-maker, the Board of Education is the final policymaker."). "That a particular agent is the apex of a bureaucracy makes the decision 'final' but does not forge a link between 'finality' and 'policy.'" Hurdle, 113 F. App'x at 427 (quoting Auriemma v. Rice, 957 F.2d 397, 400 (7th Cir. 1992)). For example, the Second Circuit in Hurdle found that even though the superintendent was the decision maker in deciding whether to transfer Hurdle, this did not "establish that she had the authority to set the policy authorizing involuntary employee transfers." Id. at 427.

Here, the final policymaking authority lies with Clarke and the Canastota Board of Education. Although Rogers, Rose, and Mitchell have the ability—in varying degrees—to make final decisions on matters involving Pistello (for example, the ability to not ask Pistello to grade the Regents Exam), the finality of their decisions does not make any of the three "final policymakers."[7] Pistello has failed to identify a final policymaker for purposes of her § 1983 claim. The Court thus grants the School District's motion to dismiss Pistello's § 1983 claim.

### D. New York Education Law § 3028-d Claim

Pistello asserts that she is entitled to whistleblower protection under New York Education Law section 3028-d, which provides that "[a]ny employee of a school district . . . having reasonable cause to suspect that the fiscal practices or actions of an employee or officer of a

---

[7]   Regarding Superintendent Clarke, the Complaint has not alleged that Clarke had any involvement with the events that took place after her response to the November 6 e-mail (an action that Pistello does not identify as negative).

school district . . . violate any local, state, federal law or rule and regulation, relating to the financial practices of such entity and who in good faith reports such information to an official of such school district" shall be free from retaliatory action by the employer.

In Batyreva v. New York City Department of Education, the court found that mere speculation that a deviation in the grading of the Regents exam could have resulted in fiscal impropriety through an impact on monetary allocations associated with the Regents exam scoring was insufficient to state a cause of action under section 3028-d. No. 101313/07, 2008 WL 1932224, at *7 (N.Y. Sup. Ct. Apr. 30, 2008), rev'd on other grounds, 869 N.Y.S.2d 440 (App. Div. 2008).

Batryreva is the only case the Court could find interpreting "fiscal practices" under section 3028-d. But its interpretation is confirmed by looking to "the plain language of the statute." Jimenez v. Quarterman, 555 U.S. 113, 118 (2009). Additionally, the New York Court of Appeals has noted that it is "a settled tenet of statutory construction that effect and meaning must be given, if possible, to every part and word of a statute." Scoglio v. County of Suffolk, 651 N.E.2d 1249, 1251 (N.Y. 1995). On its face, the statute appears to require three elements to be satisfied: (1) the employee had "reasonable cause" to believe (2) that the employer's actions involving handling or the use of school funds (3) violated a law that specifically governs the handling or use of school funds. § 3028-d. The violation of a students IEP does not involve the handling or use of school funds. Similarly, the IDEA—which handles the implementation of IEPs—is not a law that governs the handling or use of school funds. The Court thus grants the School District's motion to dismiss the section 3028-d claim.

A district court is afforded broad discretion in granting leave to amend pleadings. <u>Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel</u>, 145 F.3d 85, 89 (2d Cir. 1998). "Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." <u>Ruffolo v. Oppenheimer & Co.</u>, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam). Futility should be measured by the standards necessary to withstand a motion to dismiss pursuant to Rule 12(b)(6). <u>Gorham-DiMaggio v. Countrywide Home Loans, Inc.</u>, No. 08-CV-0019, 2009 WL 1748743, at *3 (N.D.N.Y. June 19, 2009). This case presents no facts that remotely involve the handing or use of the school district's funds or the laws governing those activities. Therefore, the Court declines to give Pistello leave to amend her section 3028-d claim. She may, however, move to amend her other claims pursuant to Local Rule 7.1(a)(4) to address the deficiencies identified in this Memorandum-Decision and Order.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Defendant's Motion for Judgement on the Pleadings (Dkt. No 12) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that Plaintiff's Title VII discriminatory hostile work environment claim and § 1983 claims are **DISMISSED** with permission to move to amend in accordance with Local Rules 7.1(a)(4); and it is further

**ORDERED**, that Plaintiff's claim under New York Education Law section 3028-d is **DISMISSED without leave to amend**; and it is further

**ORDERED**, that Plaintiff's Title VII retaliation, ADA per-se retaliation, and ADA retaliatory hostile work environment claims survive Defendant's motion; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 30, 2017
                Albany, New York

Lawrence E. Kahn
U.S. District Judge