UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHELE PISTELLO,

                          Plaintiff,

          -against-                                    5:16-CV-0212 (LEK/ATB)

THE BOARD OF EDUCATION OF THE
CANASTOTA CENTRAL SCHOOL
DISTRICT,

                          Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

On February 22, 2016, Michele Pistello commenced this action against the Board of

Education of the Canastota Central School District. Dkt. No. 1 ("Complaint"). Following the

Court's March 30, 2017 decision granting in part and denying in part Defendant's motion for

judgment on the pleadings, only the following three of Plaintiff's claims survive: (1) a retaliation

claim brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§ 2000e, *et seq.*; (2) a per se retaliation claim brought pursuant to Title II of the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131, *et seq.*, and Section 504 of the

Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; and (3) a retaliatory hostile work

environment claim brought pursuant to the ADA and the RA. Dkt. No. 20 ("March 2017 Order")

at 26. Now before the Court is Defendant's motion for summary judgment, filed on July 10, 2018

along with a memorandum and statement of material facts ("SMF"). Dkt. Nos. 36 ("Motion"),

36-1 ("Memorandum"), 36-2 ("SMF"). Plaintiff opposes the Motion. Dkt. Nos. 38

("Opposition"), 38-17 ("Response to the SMF"). For the reasons set forth below, Defendant's Motion is granted in its entirety.

## II.     BACKGROUND

### A.  Local Rule Practice

As a preliminary matter, Defendant accuses Plaintiff of violating Local Rule 7.1, see Dkt. No. 39 ("Reply") at 3–4,[1] which requires the party opposing a summary judgment motion to "file a response to [the movant's] Statement of Material Facts . . . [that] admit[s] and/or den[ies] each of the movant's assertions in a short and concise statement . . . [and] set[s] forth a specific citation to the record where the factual issue arises," L.R. 7.1(a)(3). Plaintiff properly filed her Response to the SMF and, in it, "denies virtually every paragraph [in the SMF] that would be adverse" to her. Reply at 3. However, as Defendant correctly notes, many of those denials include only unhelpful, boilerplate language, and are supported solely by Plaintiff's repetition of the same litany of pincites—including, in some cases, to allegations contained in the Complaint. Compare, Resp. SMF ¶ 95 (citing to the "Complaint ¶¶ 9–45 . . . and Plaintiff's Depo. pp. 15, 17, 19–21, 23–24, 26, 30, 54–55, [and] 61 (Exhibit 'B') and Exhibits 'F' through 'O'"), with id. ¶¶ 11–12, 14, 36, 45–49, 52–64, 73–75, 78, 86–87, 89–94 (same), and compare id. ¶ 16 (citing to the "Complaint ¶¶ 39–40 and Depo. of Plaintiff pp. 15, 17, 19–21, 23–24, 26, 30, [and] 33–34"), with id. ¶¶ 17–18, 20–34 (same). Defendant therefore asks the Court to "deem[] all the allegations of Defendant's [SMF] admitted." Reply at 2.

---

[1]  The cited page numbers for this document refer to those generated by the Court's electronic filing system ("ECF").

"Courts in this district have not hesitated to enforce Rule 7.1(a)(3) . . . by deeming facts admitted upon an opposing party's failure to properly respond." Black v. Fischer, No. 08-CV-232, 2010 WL 2985081, at *5 (N.D.N.Y. July 1, 2010) (citing Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000)). However, that remedy has typically only been employed where (1) the non-movant has failed in the first instance to file a response, see, e.g., Murray v. Goord, 668 F. Supp. 2d 344, 353 (N.D.N.Y. 2009); (2) the non-movant's response does not mirror the original SMF, see, e.g., Phipps v. N.Y. State Dep't of Labor, 53 F. Supp. 2d 551, 556–57 (N.D.N.Y. 1999); or (3) the non-movant's response provides no citations to the record whatsoever, see, e.g., McKnight v. Dormitory Auth. of State, 189 F.R.D. 225, 227 (N.D.N.Y. 1999).

Here, as Plaintiff correctly notes, she has filed a response that mirrors the SMF and contains citations to the record. Dkt. No. 46 ("Sur-Reply") at 3–4.[2] Even though Plaintiff's imprecise citations have, admittedly, "le[ft] the Court to sift through the cited pages to determine where, or even whether, anything therein actually contradicts the assertions in the corresponding paragraph of Defendant's [SMF]," Reply at 2, that alone does not provide adequate grounds for granting the relief Defendant seeks.

However, as always at the summary judgment stage, the Court reserves the right to disregard any assertions made in either the SMF or the Response to the SMF, if those "factual assertions . . . are otherwise unsupported in the record." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) ("Where . . . the record does not support the assertions in a [SMF],

---

[2] The cited page numbers for this document refer to those generated by ECF.

those assertions should be disregarded and the record reviewed independently." (citing <u>Zanghi v. Inc. Vill. of Old Brookville</u>, 752 F.2d 42, 47 (2d Cir. 1985))).

**B. Factual Background**

Unless otherwise specified, the facts set forth below are not disputed by the parties.

*1. Plaintiff's Professional History—Pre-September 2014*

Plaintiff graduated from Le Moyne College in 2004 with a Master's degree in special education. Dkt. No. 45-1 ("2015 Pistello Deposition")[3] at 7–9. She immediately began working at Blodgett Middle School in the City of Syracuse, where she taught "[r]eading, writing, listening, and speaking" to emotionally disturbed middle school-aged boys. SMF ¶¶ 3, 18; Dkt. No. 45 ("2018 Pistello Deposition")[4] at 37; Dkt. No. 36-2 at 309 ("Blodgett Performance Evaluation").[5] Plaintiff remained at Blodgett for four years, until the end of the 2007–08 school year. 2018 Pistello Dep. at 37.

On February 1, 2008, near the end of Plaintiff's employment with the City of Syracuse, Plaintiff earned New York State public school teacher certifications in both "the fields of Special Education K[–]12 and Elementary Education Pre-K[–]6." SMF ¶ 1; <u>see also</u> Dkt. No. 36-4 at 6 ("Special Education Certification"); Dkt. No. 36-4 at 8 ("Elementary Education Certification").[6]

---

[3] The 2015 Pistello Deposition, which was taken in connection with a separate suit filed by Plaintiff in state court, was attached to Defendant's SMF as Exhibit B.

[4] The 2018 Pistello Deposition was attached to Defendant's SMF as Exhibit A.

[5] The Blodgett Performance Evaluation was attached to Defendant's SMF as Exhibit D.

[6] Both the Special Education Certification and the Elementary Education Certification were attached to the affidavit of Lee Farrell, which Defendant submitted along with its Motion. Dkt. No. 36-4 at 1–4 ("Farrell Affidavit").

Although the parties agree that Plaintiff's Special Education Certification authorized her to teach special education classes at all grade levels, Resp. SMF ¶ 1; 2018 Pistello Dep. at 14–15, they disagree about the subjects Plaintiff was certified to teach. According to Defendant (by way of the Farrell Affidavit[7]), Plaintiff's Special Education Certification allows her to teach "all subjects . . . including Math, Science, Reading, English, History, etc.," within a special education setting. Farrell Aff. ¶ 9 (emphasis omitted). But Plaintiff contends that her Special Education Certification did not encompass reading instruction, since "[r]eading is not a special education service." 2018 Pistello Dep. at 15, 23; 2015 Pistello Dep. at 71–72. Plaintiff came to that conclusion after speaking over the phone with Farrell, who allegedly told her that in order to teach reading "you have to be trained in a program, either . . . Wilson or Read 180[,] and go to school for literacy." 2015 Pistello Dep. at 72–74.

In August 2008, Plaintiff started working for the Canastota Central School District (the "District"), where she remained until August 2015. SMF ¶ 2. During those seven years, Plaintiff claims that she earned substantially positive reviews, and that she only received two negative performance evaluations. 2015 Pistello Dep. at 17. First, during the 2008–09 school year Plaintiff received a negative evaluation and was placed on a teacher improvement plan. Id. at 13–14. Second, the quality of Plaintiff's performance was again called into question during the 2014–15 school year, as a result of the events described below that led to the filing of this lawsuit. Id. at 17. Defendant identifies a third negative evaluation—claiming that Plaintiff was also placed on

---

[7] In her affidavit, Farrell explains that she works as the Regional Certification Officer for the New York State Education Department assigned to the Madison-Oneida Board of Cooperative Educational Services ("BOCES"), making her "the resident source for information concerning questions about teacher certification." Farrell Aff. ¶¶ 1–2, 5.

a teacher improvement plan during the 2010–11 school year—and counters that "[w]hile [Plaintiff's] performance was acceptable" throughout her time at Canastota, "it was not exemplary." Dkt. No. 36-3 at 1–15 ("Clarke Affidavit")[8] ¶ 15.

While working for Canastota, Plaintiff held several different teaching positions at various grade levels. During the 2008–09 school year, Plaintiff worked as a "direct consultant" for K–3 students, "pushing in" to elementary school classrooms in order to assist children who were susceptible to being classified as special education students. 2018 Pistello Dep. at 15–16. In 2009–10, Plaintiff moved to the high school level where she worked again as a direct consultant, teaching English and math.[9] Id. at 17–18. During the next two school years, 2010–11 and 2011–12, Plaintiff received a more "regular teaching assignment," conducting fifteen-student self-contained special education English classes in grades ten, eleven, and twelve, though she also pushed in as a direct consultant in English for grade eleven students. Id. at 18–19. Then in 2012–13 and 2013–14, Plaintiff's consultant duties were removed and she was reassigned to teach only self-contained special education English classes for grade ten and eleven students. Id. at 19–20. However, after a conversation with Superintendent Clarke, Plaintiff was reinstated for the 2014–15 school year as a direct consultant, while still teaching self-contained classes at grades ten and eleven. Dkt. No. 1-3 ("November 2014 Email") at 2.[10] Plaintiff and Defendant

---

[8] The Clarke Affidavit, which Defendant submitted along with its Motion, was signed and submitted by June Clarke, Superintendent of the Canastota Central School District.

[9] Defendant disputes this version of events, claiming instead that Plaintiff taught at the middle school level during the 2009–10 school year. Clarke Aff. ¶ 9. However, Defendant has provided no documentation in support of that claim.

[10] The November 2014 Email was attached to Plaintiff's Complaint as Exhibit C. In her deposition testimony, Plaintiff claims that Clarke's intervention occurred prior to the 2013–14

agree that the grade-level and subject-area moves Plaintiff experienced while working for the District were "pretty typical," and that a teacher's "year to year . . . assignments are likely to change[] depending on the needs of the District." 2018 Pistello Dep. at 19.

### 2. Eleventh Grade English Scheduling Issue—September 2014 to January 2015

At the beginning of the 2014–15 school year, three of Plaintiff's "English 11" students were erroneously scheduled to leave her class after only ten minutes of class time, so that they could catch a bus to BOCES. Nov. 2014 Email at 2. As a result, those students received less English instruction than called for under their mandated Individualized Educational Programs ("IEP"), and risked failing New York's standardized test, the Regents Exam. Id. at 2–3.

On September 25, 2014, Bob Mengucci, another teacher employed by Canastota, wrote an email to Molly Mecca, principal of the high school, discussing the scheduling issue. Dkt. No. 38-8 ("September 2014 Email")[11] at 2. Also copied on that email chain were Plaintiff, Superintendent Clarke, Assistant Superintendent Jason Mitchell, Director of Special Education Carolyn Rose, and Assistant Principal Christopher Rogers. Id. In it, Mengucci explains that he and Plaintiff had attempted to resolve the situation by having the students stay after school, but were having difficulty implementing that solution. Id. Mecca responded that if the problem persisted, they should put together an "SST" or Student Study Team—a meeting of teachers and administrators designed to discuss problems related to a student's academic progress. Id.

---

school year, not the 2014–15 school year. 2018 Pistello Dep. at 20–21. However, the Court has chosen to instead credit the timeline reported in Plaintiff's November 2014 Email, as a more contemporaneous recounting of the events in question.

[11] The September 2014 Email was attached to Plaintiff's Opposition as Exhibit G.

The problem remained unresolved throughout late September, October, and early November. 2018 Pistello Dep. at 64. During those six weeks, Plaintiff called the students' parents on multiple occasions "to try to get the[ students] to come after" school, and "[c]onstantly contacted . . . Mecca about the problem, [to] try[] to get it rectified as soon as possible." Id. However, Plaintiff did not contact Rose about the ongoing problem during that time—even though Rose held primary responsibility for dealing with issues related to special education instruction in Canastota, Dkt. No. 38-6 ("Mitchell Deposition")[12] at 3—because Plaintiff believed that the September 2014 Email had put Rose "on notice" of the issue, Resp. SMF ¶ 50; 2018 Pistello Dep. at 64–65.

Then, on November 6, 2014, Plaintiff sent a follow-up email to Clarke about the scheduling issue.[13] Nov. 2014 Email at 2–3. Copied on that email were Mecca, Rogers, Mitchell, and Lori Russitano (Plaintiff's union representative), though Rose was conspicuously left off the recipient list. In the body of the November 2014 Email, Plaintiff re-raised the scheduling issue, noting that the students were likely to fail both her class and the Regents Exam, and accusing the District of failing to comply with the students' IEPs. Id. Plaintiff concluded that she hoped the scheduling issue would be resolved "for the students' sake," and also shared her belief that it constituted "a direct attack on [her] to sully [her] reputation." Id. at 3.

---

[12] Excerpts from the Mitchell Deposition were attached to both Defendant's SMF (as Exhibit H) and Plaintiff's Opposition (as Exhibit E).

[13] The November 2014 Email also addressed a separate, unconnected issue related to Plaintiff's recently-reinstated consulting duties. Nov. 2014 Email at 2. In brief, Plaintiff complained that a second logistical failing—for which Plaintiff blamed Rose—meant that Plaintiff's Annual Professional Performance Review ("APPR") could be affected by the standardized test scores of students with which Plaintiff had no contact during the school day. Id.

Clarke replied to Plaintiff's November 2014 Email the next day, on November 7, 2014, copying in Rose. Id. at 2. In that email, Clarke wrote that Mecca and Rogers were "working with guidance/transportation to work out a solution for the students," and requested a meeting with Rose and Plaintiff to further discuss the issues Plaintiff raised. Id. But no such meeting occurred, and the scheduling issue remained unresolved. 2018 Pistello Dep. at 68.

A month later, on December 18, 2014, Rose sent Plaintiff a separate follow-up email titled "Special Education Students." Dkt. No. 38-9 ("December 2014 Rose Email")[14] at 2. Rose began by noting that the scheduling issue had been "brought to [her] attention," then wrote the following:

> In order to remedy this problem, I need to be informed immediately by you of any issue. . . . I am unable to fix any problems of which I am unaware. Apparently this particular problem has been occurring since September, yet you have failed to inform me. You have established a pattern of informing others and not making me aware of the situation. As your supervisor, this needs to cease immediately. . . . From this point forward, I direct that any issues involving IEPs, or issues with special education students, you bring to my attention first. If my directive is not followed, I will have no other recourse but to pursue formal administrative action.

Id. The next day, Plaintiff sent the following reply to Rose, now also copying Mecca, Rogers, Mitchell, Russitano, and Clarke:

> I am perplexed[—]once again[—]with your statement that you were unaware of the situation involving the three students that attend BOCES during my English class. . . . It is my understanding[—]per Bob Mengucci[—]that he informed you before the end of the previous school year that this was going to be a problem. I shared this with [Mecca], [Rogers], [Clarke], and [Mitchell] in September . . . and I did not include you [on that email] because I knew that you ALREADY knew of this situation . . . . I am disturbed that you[—]an

[14] The December 2014 Rose Email was attached to Plaintiff's Opposition as Exhibit H.

administrator[—]would threaten me in words (see e-mail) and continuously try to label me an insubordinate worker who relishes breaking the rules.

Dkt. No. 36-10 ("December 2014 Pistello Email")[15] at 2. It appears that the recipients of the December 2014 Pistello Email chose not to reply to Plaintiff, and the record contains no further communications involving Plaintiff related to the scheduling issue.

The issue was finally resolved sometime in January 2015, 2018 Pistello Dep. at 66, after Mitchell told BOCES that Plaintiff's English class needed to take precedence over the students' BOCES instruction, Mitchell Dep. at 11; Dkt. No. 38-4 ("Clarke Deposition")[16] at 44. Soon thereafter, the students' bussing schedule was adapted to allow for a full English instructional period. 2018 Pistello Dep. at 65–66.

### 3. Regents Exam Scoring, the First Professional Conduct Meeting, and the Counseling Memorandum—January 2015

During the approximately four or five years prior to the 2014–15 school year, Plaintiff occasionally participated in the scoring of English Regents Exams taken by Canastota students.[17] Id. at 80–81. Normally only teachers from the English Department were entrusted with evaluating those tests—which occurred twice each school year, in January and June—but Ed Rinaldo, the Principal who preceded Mecca, "threw [Plaintiff] in" to the grading process just in case "there was some sort of discre[pancy] about what [one of Plaintiff's students] w[as] trying

---

[15] The December 2014 Pistello Email was attached to Plaintiff's Opposition as Exhibit I.

[16] Excerpts from the Clarke Deposition were attached as both Exhibit E to the Clarke Affidavit and as Exhibit C to Plaintiff's Opposition.

[17] During one of those years—the 2013–14 school year—Plaintiff also graded "state tests at BOCES" for seventh and eighth grade English students. Id. at 81.

to say." Id. at 80, 82–83; see also SMF ¶ 62. Therefore, Plaintiff appears only to have participated in the Regents Exam grading process when her students' exams were being graded. See 2018 Pistello Dep. at 87–88 ("I didn't score the [exams] in June [2015]. Because my special ed kids passed, so there was no need for me to be in there to answer any questions about them."). Plaintiff was the only special education teacher involved in the scoring of Regents Exams, id. at 80–81, a task that was completely voluntary and for which teachers received no financial benefit, id. at 88–89; Resp. SMF ¶ 57.

Sometime prior to the January 2015 exam period, Assistant Principal Rogers informed Plaintiff that she would no longer be participating in the scoring process. Clarke Dep. at 45; 2018 Pistello Dep. at 86–87. According to Superintendent Clarke, that decision came as part of the District's broader attempt "to be consistent with all the departments" by "having just the . . . teachers that were certified in [a given subject] area scoring the Regents Exams." Clarke Dep. at 45. Plaintiff was upset by that decision, because the exam included a critical lens essay that was not part of many English teachers' curricula. Id. at 84–85. She therefore believed that many English instructors would have difficulty properly evaluating that portion of the exam. Id.

On January 23, 2015, after she had been removed from the Regents Exam scoring team, Plaintiff met briefly with Mecca. Dkt. No. 36-3 at 39 ("Revised Counseling Memorandum")[18]; 2018 Pistello Dep. at 90–91. Plaintiff asked Mecca to score a paragraph written by a student using the 0–2 scale set out in the Regents Exam rubric (with 2 as the highest possible score). Revised Counseling Mem. Mecca did so, assigning a grade of "1 or a possible 2." Revised

_____

[18]   The Revised Counseling Memorandum was attached as Exhibit G to the Clarke Affidavit.

Counseling Mem. Plaintiff argued that the essay should have been given a 2, and Mecca agreed that she "would err on the higher score for the student." Id.

Following that meeting, Mecca learned that the paragraph (1) had been written by a special education student; (2) had been scored a "1" by one of Plaintiff's colleagues; and (3) had already been shown by Plaintiff to another, retired teacher, Mr. Bazon. Id.; 2015 Pistello Dep. at 27–30. Mecca therefore felt that Plaintiff had "misused [Mecca's] score o[f] a possible '2' to undermine [her] colleagues," because Plaintiff "did not have confidence in [her] colleagues to adequately score the [Regents E]xam." Revised Counseling Mem. Mecca also learned that Plaintiff "believed that [she] and another colleague had been excluded purposely by administration" from the Regents Exam scoring process. Id.

A few days later, on January 26, 2015, Mecca and Rogers sent Plaintiff a form document calling her to a professional conduct meeting (the "First Professional Conduct Meeting") to discuss her behavior. Dkt. No. 36-2 at 319 ("First Professional Conduct Memorandum")[19]; SMF ¶ 65. At that meeting—which occurred on January 27, 2015, and which Plaintiff attended along with her union representative, Russitano—Mecca and Rogers briefly discussed Plaintiff's decision to show Mecca the paragraph. Clarke Dep. at 55–56; 2018 Pistello Dep. at 90. However, Plaintiff left the meeting without "know[ing] what [she] did wrong."

---

[19]   The First Professional Conduct Memorandum was attached to Defendant's Motion as Exhibit F. Also included in that Exhibit are three later professional conduct memoranda that were also sent to Plaintiff, on February 11, February 25, and March 6, 2015. See Dkt. No. 36-2 at 320 ("Second Professional Conduct Memorandum"); Dkt. No. 36-2 at 321 ("Third Professional Conduct Memorandum"); Dkt. No. 36-2 at 322 ("Fourth Professional Conduct Memorandum"). All four of those memoranda were originally placed in Plaintiff's Canastota personnel file, but were later expunged at the request of Plaintiff's attorney. See Clarke Dep. at 54.

On February 25, 2015, Mecca sent Plaintiff a document (1) recording their discussion during the First Professional Conduct Meeting; (2) expressing Mecca's concerns; and (3) offering "suggestions" to "help [Plaintiff] avoid further problems of this nature." Dkt. No. 36-3 at 36–37 ("Counseling Memorandum"). Plaintiff objected to the content of that document, and hired an attorney to help negotiate certain modifications. 2018 Pistello Dep. at 94. Plaintiff and Mecca then drafted the Revised Counseling Memorandum in a manner "which was acceptable to [] Plaintiff." Clarke Aff. ¶ 36; but see 2018 Pistello Dep. at 94 ("They removed some of the things that I felt weren't true, but still left some things in there that still weren't true.").[20] The "softened" Revised Counseling Memorandum was then placed in Plaintiff's Canastota personnel file, though she faced no other discipline as a direct result of the scoring incident. Id. at 92–94, 103–04.

### 4. The D.J. Incident, the Second Professional Conduct Meeting, and the Harassment Report—February 2015

On February 3, 2015, Plaintiff assigned one of her students, D.J., detention "because he refused to obey her directive to refrain from using headphones and his phone in class." Dkt. No. 36-2 at 324–36 ("Harassment Findings")[21]; 2018 Pistello Dep. at 95. However, D.J. did not attend Plaintiff's detention, and the next day, February 4, 2015, Plaintiff assigned him another detention as discipline for skipping the first detention. 2018 Pistello Dep. at 95, 99; Dkt.

---

[20] Despite Plaintiff's reservations, the Court finds that the Revised Counseling Memorandum mirrors exactly Plaintiff's testimony about the events surrounding Plaintiff's January 23, 2015 meeting with Mecca. Compare Revised Counseling Mem., with 2018 Pistello Dep. at 89–94. Therefore, the Court will treat the Revised Counseling Memorandum as an accurate and undisputed account of those events.

[21] The Harassment Findings were attached to Defendant's SMF as Exhibit G. The cited page numbers for that document refer to those generated by ECF.

No. 38-14 ("D.J. Incident Report")[22] at 2. D.J. skipped that detention as well. 2018 Pistello Dep. at 99. Afterwards, Plaintiff heard from "another student" that, when asked about the detentions, D.J. said to the student that "[Plaintiff] can suck my dick." D.J. Incident Report at 2.

In response to D.J.'s behavior, Plaintiff asked the school's weight room supervisor, Brenda Jenkins, to deny D.J. access to the weight room. Harassment Findings at 325; 2018 Pistello Dep. at 99; 2015 Pistello Dep. at 47; Dkt. No. 38-5 ("Rogers Deposition")[23] at 39. Pistello had worked as the high school's weight room attendant during the 2011–12 and 2012–13 school years, and believed that school policy forbade a student caught skipping detention from exercising their "privilege" to use the weight room. 2018 Pistello Dep. at 96–98.

Soon thereafter, Assistant Principal Rogers was alerted to the situation when, from inside his office, he heard D.J. "yelling and screaming . . . in the hallway." Rogers Dep. at 38. While trying to de-escalate the situation, Rogers learned that Plaintiff had denied D.J. weight room access. Id. at 39. Rogers then escorted D.J. to the weight room and instructed the attendant to disregard Plaintiff's instruction and to provide D.J. access. Id. at 39.

Immediately thereafter, Rogers called Plaintiff into his office for a meeting to discuss the incident. Id. at 42. Among other things, Rogers told Plaintiff that she had "overstepp[ed] her bounds" by operating "outside the chain of command and beyond what was prescribed in the Student Handbook." Harassment Findings at 325. Plaintiff replied that "[i]n all the years that [she] had] been teaching, [she had] never had a student say that to [her]." 2015 Pistello Dep. at 101.

_____

[22] The D.J. Incident Report was attached to Plaintiff's Opposition as Exhibit M.

[23] The Rogers Deposition was attached to Plaintiff's Opposition as Exhibit D.

Rogers responded that he "f[ou]nd that hard to believe." Id.; Dkt. No. 38-15 ("Harassment Report")[24] at 3; Rogers Dep. at 44.

On February 11 and February 25, 2015, Mecca and Rogers sent Plaintiff two more professional conduct memoranda asking her to attend meetings in Mecca's office to discuss the D.J. incident. Second Prof'l Conduct Mem.; Third Prof'l Conduct Mem.; SMF ¶ 65. Based on Plaintiff's and Rogers's testimony, it appears that only one such meeting actually occurred, on March 4, 2015 (the "Second Professional Conduct Meeting"). 2018 Pistello Dep. at 79; Rogers Dep. at 53. At that meeting, Mecca asked Plaintiff "why [she] had gone beyond the normal course of discipline" with D.J., and expressed her concern that Plaintiff "was not following the normal rules and procedures of . . . the school system." Rogers Dep. at 53. Plaintiff did not receive a counseling memorandum after that meeting, 2018 Pistello Dep. at 102–04, and the record contains no indication that any other disciplinary action was taken against Plaintiff as a direct result of the D.J. incident.

On February 27, 2015—between the date that Plaintiff received the Third Professional Conduct Memorandum and the date of the Second Professional Conduct Meeting—Plaintiff filed a sexual harassment report objecting to Rogers's comments during their February 4, 2015 meeting. Harassment Report at 2–3; Resp. SMF ¶ 68. Assistant Superintendent Mitchell investigated Plaintiff's allegations, including by interviewing both Rogers and Plaintiff. Resp. SMF ¶¶ 68–70; Harassment Findings at 325. In his ensuing report, dated May 20, 2015, Mitchell characterized Rogers's "I find that hard to believe" comment as "simply [a] reacti[on] to what he

---

[24] The Harassment Report was attached to Plaintiff's Opposition as Exhibit N. The cited page numbers for this document refer to those generated by ECF.

believed to be [Plaintiff's] gross understatement of the frequency with which high school students make crude remarks," and found that no sexual harassment had occurred. Harassment Findings at 325.

### 5. The Fourth Professional Conduct Memorandum—March 2015

On March 6, 2015, Mecca sent Plaintiff the Fourth Professional Conduct Memorandum. That document also directed Plaintiff to attend a meeting in Mecca's office, Fourth Prof'l Conduct Mem., though no such meeting actually occurred, 2018 Pistello Dep. at 100–01. The Fourth Professional Conduct Memorandum cited Plaintiff for failing to "follow administrative directives to return [two] signed letters"—a "Letter of Counsel" and the Third Professional Conduct Memorandum. Just like the First, Second, and Third Professional Conduct Memoranda, the Fourth Professional Conduct Memorandum was added to Plaintiff's personnel file but later expunged. Clarke Dep. at 54. Plaintiff faced no further disciplinary action as a direct result of the incidents it described.

Thus, by March 6, 2015, Plaintiff had received four professional conduct memoranda over the course of approximately six weeks. In his two years working at the high school, Vice Principal Rogers only knew of "[m]aybe half a dozen or eight" instances in which similar form documents had been issued to other instructors. Rogers Dep. at 30–31.

### 6. Bullying Investigation Involving Plaintiff's Son—April 2015

In late April 2015, Assistant Superintendent Mitchell emailed Plaintiff about an investigation he was conducting regarding Plaintiff's son, J.P. Compl. ¶ 42; SMF ¶ 81; 2015 Pistello Dep. at 110–11. According to Mitchell, the investigation arose out of an unnamed student's allegation that J.P. had been using a Snapchat account to bully another student, J.F.

SMF ¶ 81; 2015 Pistello Dep. at 110–11. Mitchell wanted to hold a mediation between J.P. and J.F., but Plaintiff objected "that there was no need to have a mediation because [J.P. and J.F. weren't] even arguing," and because J.P. did not have a Snapchat account. 2015 Pistello Dep. at 111–13; SMF ¶ 81. Mitchell and Plaintiff continued to exchange emails, with Mitchell asking why Plaintiff was against the mediation, and Plaintiff responding (1) that she "didn't want to put [her] son under any type of stress;" (2) that, as J.P.'s mother, "when [Plaintiff] said that there [wa]s going to be no mediation, th[e] case [wa]s closed;" and (3) that she "d[id] not want to be contacted about th[e mediation] anymore." 2015 Pistello Dep. at 112.

Mitchell respected Plaintiff's wishes and chose not to hold a mediation between J.P. and J.F. during the 2014–15 school year.[25] 2015 Pistello Dep. at 113. Mitchell did continue investigating the bullying allegation, however, including by calling J.P. into his office to discuss it. Compl. ¶ 42. Eventually, Mitchell determined that the allegation was "unfounded" and decided not to take any disciplinary action. Clarke Dep. at 103; 2015 Pistello Dep. at 114.

### 7. Plaintiff's APPR—May 2015

At some point during the 2014–15 school year, Plaintiff learned that the in-class observation portion of her APPR[26] would be conducted by Director of Special Education Rose.

---

[25]  A mediation between J.P. and J.F. did occur the following year, conducted by the new principal in charge of the high school (who replaced Mecca prior to the 2015–16 school year). 2015 Pistello Dep. at 113; SMF ¶¶ 83–84.

[26]  The in-class observation consists of five stages: (1) the evaluator meets with the teacher a few days prior to the observation; (2) the evaluator observes the teacher's in-class performance; (3) the evaluator offers a preliminary report of their observations and the teacher's scores under the APPR rubric; (4) the teacher and evaluator hold a post-observation conference to discuss the preliminary report; and (5) the evaluator completes a final report. 2018 Pistello Dep. at 55; 2015 Pistello Dep. at 55–57.

Compl. ¶ 33; Dkt. No. 36-3 at 23–27 ("2015 APPR").[27] In prior years, Principal Mecca had

completed Planitiff's in-class observation, but the District decided prior to the 2014–15 school

year that Rose would instead observe all of the special education teachers from "K to twelve."

2015 Pistello Dep. at 55, 62. Plaintiff feared that Rose "wasn't going to be fair" in conducting

her observation, because Rose "didn't like [Plaintiff]" and exhibited a "negative [and] sarcastic"

attitude towards her. 2018 Pistello Dep. at 58, 61. Therefore, Plaintiff's attorneys sent a "formal

letter" to the District objecting to Rose and requesting an alternate observer. Compl. ¶ 35.

The District denied Plaintiff's request and insisted that Rose conduct the observation. Id.

According to Superintendent Clarke, Plaintiff's request was rejected because Rose was Plaintiff's

direct supervisor, and "according to [Plaintiff's] contract and according to APPR, [Plaintiff]

need[ed] to have [he]r supervisor do the observation." Clarke Dep. at 92; see also Clarke Aff.

¶ 27 ("Under the policies and regulations of the [] District, Carolyn Rose was required to be

[Plaintiff's] evaluator."). Additionally, though the District had other trained evaluators who could

have performed Plaintiff's observation, Clarke contends that Rose "ha[d] the most expertise in

special education and [could] do the best evaluation." Clarke Dep. at 92.

The parties disagree substantially about what happened during the in-class observation

portion of Plaintiff's 2015 APPR. According to Plaintiff, Rose's preliminary report of Plaintiff's

performance assigned her an overall score lower than "highly effective," the highest possible

rating. 2018 Pistello Dep. at 56. Plaintiff then identified several "inaccuracies" in the preliminary

report, which she "color coded" and "rebutt[]ed" at her post-observation conference with Rose.

Id. at 55. During that meeting, Rose "had trouble [explaining] her comments," at least one of

---

[27]   The 2015 APPR was attached as Exhibit D to the Clarke Affidavit.

which was eventually removed from Plaintiff's evaluation. Id. at 55–56. However, even after taking Plaintiff's rebuttals into consideration, Rose did not alter Plaintiff's overall score. Id. at 56. Only after the post-observation conference, when Plaintiff "talked to [her] attorney" who in turn "spoke[] to . . . Rose about the inaccuracies," was Plaintiff's score changed to 95 points out of 100, a highly effective rating. Id. at 56–57.

According to Defendant, on the other hand, Rose "was professional and objective" in conducting Plaintiff's in-class observation, and "at no time intimidated or in any way . . . restrained [Plaintiff from] presenting her point of view." Clarke Aff. ¶¶ 29, 33. Although Defendant admits that, during the post-observation conference, Plaintiff "did . . . obtain minor changes [to] some of the language used in the evaluation form itself," Defendant maintains that Plaintiff's "overall rating was NOT changed." Id. ¶ 31; Clarke Dep. at 96. Thus, according to Defendant, Rose always rated Plaintiff as "highly effective," even in the preliminary report she completed prior to her post-observation conference with Plaintiff. Clarke Aff. ¶ 32.

### 8. Middle School Teaching Assignment—June 2015

On approximately June 25, 2015, the last day of the 2014–15 school year, all of the teachers employed by the District—including Plaintiff—received their teaching assignments for the following year. SMF ¶ 12; 2018 Pistello Dep. at 22. For special education teachers, those assignments were always made by Rose, as the District's Director of Special Education. 2018 Pistello Dep. at 27. After reviewing her 2015–16 assignment, Plaintiff was "shocked" to see that she had been moved from the high school to the middle school, where she was assigned to teach math and reading to seventh and eighth grade special education students. Id. at 22, 24; 2015 Pistello Dep. at 70; Clarke Aff. ¶ 66.

Plaintiff took issue with her 2015–16 assignment for multiple reasons. First, Plaintiff contends that she "didn't understand why [she] was [being] sent to the middle school [since she] was very successful . . . teaching English and getting passing grades" at the high school level. 2015 Pistello Dep. at 76. But according to Defendant, the District routinely "moves teachers in order to accommodate the needs of the School District," "for the benefit of the [District's] students," and to help teachers "keep their skills fresh." Clarke Aff. ¶ 60. Therefore, Defendant argues that Plaintiff "was selected for reassignment because she was an experienced middle school teacher," and the "District needed a strong and well-qualified middle school teacher to teach" the classes to which Plaintiff was assigned. Id. ¶ 57, 61.

Second, Plaintiff believed—based on "common knowledge" and on conversations she had with her colleagues—that "if you are sent down to the middle school, it's usually because you cannot do something right in the high school." 2015 Pistello Dep. at 76–77. Defendant disputes that characterization, arguing that it "know[s] of no basis for" the claim that the "reassignment of a teacher from the high school to the middle school [would be] considered . . . a 'demotion.'" Farrell Aff. ¶ 19. Indeed, Defendant claims that "[t]eaching at the middle school level is said to be a very rewarding and challenging aspect of teaching." Id. ¶ 20.

Third, Plaintiff "felt that if [she] was going to be moved to the middle school[, she] would at least be teaching English, not math," since she had no experience teaching the "common core math" curriculum that had recently been adopted by the District. 2018 Pistello Dep. at 29–31. Plaintiff was concerned that, if she struggled with the common core material, her APPR scores would suffer and she could be "fired within three years." 2015 Pistello Dep. at 78. Defendant appears to concede that Plaintiff had no experience teaching the common core

curriculum, Clarke Aff. ¶ 63, but notes that her inexperience with that subject matter did not impose a "legal impediment to [Plaintiff] teaching . . . math to [s]pecial [e]ducation students at the middle school level," Farrell Aff. ¶ 15.

Plaintiff did not personally discuss her 2015–16 assignment with Clarke, Rose, Mecca, or any other administrators, and did not file a grievance through the teachers union. 2015 Pistello Dep. at 77; 2018 Pistello Dep. at 31–32. Instead, Plaintiff hired an attorney, who met with the District about changing Plaintiff's assignment. 2018 Pistello Dep. at 32. As a result of those discussions, "the District agreed to modify [Plaintiff's] assignment . . . so that she would still be teaching [s]pecial [e]ducation at the middle school level"—apparently within the context of a resource room assignment, id.—"but another teacher would be assigned to teach the [m]ath portion of the program," Clarke Aff. ¶ 63. However, the District asserts that it "could not relieve [Plaintiff] of the responsibility to teach reading," since that constitutes a "fundamental" role of special education instruction. Id. ¶¶ 64–65.

Both parties agree that "[i]t's pretty typical" for teachers' assignments to change from year to year "depend[ing] upon the needs of the District." 2018 Pistello Dep. at 19. In fact, along with Plaintiff, a number of both special education and regular education teachers were also reassigned for the 2015–16 school year. See Dkt. No. 36-3 at 60–62 ("Staff Assignment Changes")[28] (listing the thirty other staff assignment changes implemented by the District between the 2014–15 and 2015–16 school years); see also SMF ¶ 27; 2018 Pistello Dep. at 27–29. Among those reassigned staff members were seven special education

_____

[28] The Staff Assignment Changes were attached as Exhibit J-2 to Defendant's Clarke Affidavit.

teachers—including at least two, Laura Blessing and Jennifer Kurak, who moved to the District's middle school from its elementary and high school, respectively, Staff Assignment Changes at 61–62—and three non-special education teachers—Tina Davis, Trish Micaroni, and John Slater—who moved from assignments at the high school to assignments at the middle school, id. at 60.

The parties also agree that Plaintiff's 2015–16 assignment to the middle school would not have affected her salary or benefits package, and that Plaintiff would still be working under the same Collective Bargaining Agreement. Resp. SMF ¶ 28. And Plaintiff admitted during her 2018 deposition that, following the elimination of her math instruction responsibilities, she "would have essentially the same hours of work" and the "[s]ame duties" at the middle school, which was located in the same building as the high school. 2018 Pistello Dep. at 29, 32–33.

### 9. Aftermath—Post-June 2015

During the summer of 2015, Plaintiff began seeking employment outside the District. Id. at 40–41. She did so because of her feeling "that [Canastota] was a hostile working environment and [that] the move to the middle school was a negative move and something that was a punishment." Id. at 41.

At the end of August 2015, Plaintiff received an offer from the City of Syracuse to teach seventh grade special education students at Danforth Middle School. Id. at 7–8, 47; 2015 Pistello Dep. at 66–67. In that role, Plaintiff would once again be working as a consultant, pushing in to help students in English, math, social studies, and science. 2018 Pistello Dep. at 7. Plaintiff's salary while working for the City of Syracuse was higher than the salary she earned working for

the District, though her hours and benefits package were slightly worse. 2015 Pistello Dep. at 67–69.

Just before the start of the 2015–16 school year, Plaintiff informed the District of her decision to leave Canastota in favor of the Syracuse position. 2018 Pistello Dep. at 47.

### C. Procedural History

Plaintiff filed her Complaint on February 22, 2016, alleging violations of (1) Title VII; (2) the ADA; (3) the RA; (4) the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; and (5) New York Education Law § 3028-d. Compl.

On April 29, 2016, Defendant filed a motion for judgment on the pleadings, Dkt. No. 12 ("MJP"), which the Court granted as to Plaintiff's § 1983, § 3028-d, and Title VII hostile work environment claims, March 2017 Order at 26. However, the Court denied Defendant's MJP as follows: First, the Court held that the Complaint sufficiently stated a Title VII retaliation claim, because the temporal proximity between Plaintiff's Harassment Report and Rose's decision to reassign Plaintiff for the 2015–16 school year "[wa]s sufficiently short to infer" retaliatory motive "in the context of a motion for judgment on the pleadings." Id. at 16 (citing Corzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)). Second, the Court allowed Plaintiff's ADA/RA per se retaliation claim to proceed, because (1) the November 2014 Email constituted protected activity under the ADA and the RA, since Plaintiff was advocating on behalf of her disabled students, id. at 17–19; (2) the District was aware of that activity, id. at 20; (3) as-pled, Plaintiff's 2015–16 reassignment "r[ose] to the level of an adverse action," id.; and (4) "the seven-month gap between the [November 2014 Email] and [Plaintiff's] notice of transfer [wa]s . . . close enough to plausibly infer a causal connection," id. at 21. Third, the Court chose

not to dismiss Plaintiff's ADA/RA retaliatory hostile work environment claim, because when "[t]aken as a whole," the events set out in the Complaint as occurring after the November 2014 Email "were objectively pervasive given their frequency and . . . negative impact on [Plaintiff]" to sufficiently plead the existence of a hostile work environment. Id. at 22.

Following discovery and a failed mediation, Defendant filed for summary judgment on July 10, 2018. Mot. In the Memorandum attached to its Motion, Defendant argues that (1) the December 2014 Rose Email "was neither discriminatory nor retaliatory," Mem. at 13–16;[29] (2) none of the Counseling Memorandum, the Professional Conduct Memoranda, or the 2015 APPR constituted "adverse employment action under New York law," id. at 17–20, 23–25; (3) Plaintiff's 2015–16 teaching assignment "was not evidence of retaliation," id. at 20–23; and (4) Plaintiff has not established a "claim of constructive discharge," id. at 25–27. Plaintiff opposes the Motion, arguing in broad terms that "the Complaint does state" claims for retaliation under Title VII, the ADA, and the RA, as well as for constructive discharge. Opp'n at 18–29.[30]

Defendant replied to Plaintiff's Opposition on August 3, 2018, reiterating many of the same points addressed in its Memorandum. Reply. However, as the Court noted in its February 4, 2019 text order, the Reply also "contain[ed] arguments and . . . address[ed] issues not developed in [Defendant's] motion papers." Dkt. No. 42 ("February 2019 Text Order"). For example, the Reply newly argued (1) that Plaintiff's Response to the SMF was deficient, and that the SMF should therefore be deemed admitted pursuant to Local Rule 7.1(a)(3), Reply at 1–2; see also supra Part II.A; and (2) more broadly, that even if the behavior challenged by the Complaint

---

[29]  The cited page numbers for this document refer to those generated by ECF.

[30]  The cited page numbers for this document refer to those generated by ECF.

constituted materially adverse actions within the meaning of Title VII, the ADA, or the RA, "Defendant has articulated . . . legitimate, nonretaliatory rationale[s]" for those actions, Reply at 4–8.

"Instead of disregarding th[o]se improperly raised arguments," the Court allowed Plaintiff to file a sur-reply addressing Defendant's Reply, and informed the parties that it would "then consider both the Reply and any sur[-]reply when deciding Defendant's [M]otion." Feb. 2019 Text Order (citing Domino Media, Inc. v. Kranis, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998); Lee v. Coughlin, 26 F. Supp. 2d 615, 617 n.2 (S.D.N.Y. 1998)). Plaintiff filed such a sur-reply on February 13, 2019, arguing only that (1) Plaintiff complied with Local Rule 7.1(a)(3); and (2) Plaintiff "has met her burden of proof on her Title VII and ADA retaliation claims." Sur-Reply at 3–5.

## III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Plaintiff's Title VII Retaliation Claim

Title VII prohibits "discriminat[ion] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a)(1). Title VII also includes an anti-retaliation provision, which makes it unlawful "for an employer to discriminate against any . . . employee[] . . . because [that individual] opposed any practice" made unlawful by Title VII or

"made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." § 2000e-3(a). "This anti-retaliation provision is intended to further the goals of the anti-discrimination provision 'by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees.'" Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006)).

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis," Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005), known as the McDonnell Douglas framework, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). First, a plaintiff must satisfy the "de minimis" burden of establishing a prima facie case of retaliation by showing "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Id. (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282–83 (2d Cir. 2001)). "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Id. (citing Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)).

"If the plaintiff sustains this initial burden, 'a presumption of retaliation arises,'" and the defendant must proceed to the second step: "'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" Hicks, 593 F.3d at 164 (quoting Jute, 410 F.3d at 173). In the event the employer can do so, the burden shifts back to the employee to "show that retaliation

was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision or that the employer's reason was pretextual." Senese v. Longwood Cent. Sch. Dist., 330 F. Supp. 3d 745, 772 (E.D.N.Y. 2018) (certain internal quotation marks and citation omitted). However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," the employer is entitled to judgment as a matter of law. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

### 1. Plaintiff's Prima Facie Case—Materially Adverse Action

Defendant's Motion focuses primarily on the first stage of Title VII's three-part inquiry, and specifically on rebutting Plaintiff's claim that she suffered a materially adverse action.

Within the context of a Title VII retaliation claim, a materially adverse action is one that "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (quoting White, 548 U.S. at 57). "Material adversity is to be determined objectively, based on the reactions of a reasonable employee." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011). The Supreme Court has cautioned that

> [c]ontext matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training

> lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

White, 548 U.S. at 69 (internal quotation marks and citations omitted). However, "Title VII is not a general 'bad acts' statute," Wimmer v. Suffolk Cty. Police Dep't, 176 F.3d 125, 135 (2d Cir. 1999), and does not protect individuals from retaliation that fails to produce "an injury or harm," White, 548 U.S. at 67. Additionally, the "'petty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." Hicks, 593 F.3d at 165 (quoting White, 548 U.S. at 68).

As the Court explained in its March 2017 Order, "only [those] events that occurred after February 27, the day [Plaintiff] filed the [Harassment Report]," could constitute a qualifying adverse action for the purposes of her Title VII retaliation claim. March 2017 Order at 14. Those events include: (1) the March 4, 2015 Second Professional Conduct Meeting; (2) the March 6, 2015 Fourth Professional Conduct Memorandum; (3) Assistant Superintendent Mitchell's April 2015 investigation involving J.P.; (4) Plaintiff's May 2015 APPR; and (5) Plaintiff's end-of-year teaching reassignment. However, the Court must evaluate those "alleged acts of retaliation . . . both separately and in the aggregate as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." Hicks, 593 F.3d at 165 (internal quotation marks and citation omitted).

### a. The Second Professional Conduct Meeting, the Fourth Professional Conduct Memorandum, and the 2015 APPR

The Court finds that none of the Second Professional Conduct Meeting, the Fourth Professional Conduct Memorandum, or the 2015 APPR, "considered both separately and in the

aggregate," id., would have dissuaded a reasonable employee from making or supporting a charge of discrimination.

The Second Professional Conduct Meeting was initiated by form memoranda sent on February 11 and February 25, 2015, Second Prof'l Conduct Mem.; Third Prof'l Conduct Mem., prior to Plaintiff's protected activity. Moreover, both the Second Professional Conduct Meeting and the Fourth Professional Conduct Memorandum could be described as "criticism" that was "necessary to allow [Plaintiff to develop, improve[,] and avoid discipline." Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Courts in this Circuit have determined that critiques of that sort do not qualify as materially adverse actions "in the absence of other negative results such as a decrease in pay or being placed on probation," none of which occurred in Plaintiff's case. Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (quotation marks and citation omitted); see also Weeks, 273 F.3d at 86 (finding that the issuance of a "notice of discipline" and "counseling memo" did not constitute materially adverse employment actions for purposes of retaliation prima facie case); Tepperwien, 663 F.3d at 570–71 (citing Weeks in finding that counseling received by employee was not a materially adverse action under Title VII's anti-retaliation provision).

As to the 2015 APPR, Plaintiff bases her claim of retaliation on (1) the fact that her evaluation was conducted by Rose, who "didn't like" Plaintiff, 2018 Pistello Dep. at 61; and (2) Rose's preliminary evaluation, which, Plaintiff asserts, contained factual inaccuracies and a rating lower than "highly effective," id. at 56–57. Although the record does not indicate when exactly Plaintiff objected to Rose as her APPR evaluator, Plaintiff admits that Rose's

appointment as evaluator for all special education teachers occurred prior to the start of the 2014–15 school year, long before Plaintiff's protected activity. 2015 Pistello Dep. at 55, 62. Also, regarding Plaintiff's less-than-perfect preliminary rating, while courts in this Circuit have routinely held that "a poor performance evaluation could very well deter a reasonable worker from complaining," see, e.g., Vega, 801 F.3d 72, 92 (citation omitted), they have explicitly distinguished from that category performance reviews that, though lower than previous reviews the employee received, were still positive overall, see, e.g., Moy v. Perez, 712 F. App'x 38, 41 (2d Cir. 2017) (holding that positive performance evaluations, even if less positive than those received in previous years, cannot "plausibly make out an adverse employment action" in the retaliation context); Byrne v. Telesector Res. Grp., Inc., 339 F. App'x 13, 17 (2d Cir. 2009) (same). Rose's preliminary review of Plaintiff falls squarely in the latter camp—although Plaintiff asserts that Rose originally did not rate her as "highly effective," 2018 Pistello Dep. at 56, she does not claim (and the record nowhere indicates) that Rose's original score would have resulted in a "negative" review overall.

As a result, the Court finds that Plaintiff cannot maintain an actionable Title VII claim based on any of the Second Professional Conduct Meeting, the Fourth Professional Conduct Memorandum, and/or the 2015 APPR.

### b. The J.P. Investigation

The J.P. investigation, on the other hand, presents a much closer question. The parties have not cited any Second Circuit cases in which a Title VII claim has been based on retaliation against a complainant's family member in response to a complainant's protected activity. However, it appears to the Court that a reasonable employee would be dissuaded from making or

supporting a charge of discrimination if the employee knew that the subject of their complaint planned to impose pretextual disciplinary proceedings on a close family member. Indeed, the Second Circuit's First Amendment intimate association retaliation doctrine—pursuant to which a § 1983 claim can arise out of "retaliatory action [taken] against one family member based on the conduct of another in exercising a First Amendment right," Talley v. Brentwood Union Free Sch. Dist., No. 08-CV-790, 2009 WL 1797627, at *6 (E.D.N.Y. June 24, 2009) (internal quotation marks omitted) (citing Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999))—provides tangential support for such a proposition.

The specific circumstances surrounding the J.P. investigation—including, most notably, Assistant Superintendent Mitchell's decision to respect Plaintiff's wishes and not hold a mediation, 2015 Pistello Dep. at 113—raise some doubt as to whether it actually constituted a materially adverse action in the context of the present case. However, since the Court finds that Plaintiff's Title VII retaliation claim should be dismissed on alternative grounds, it will nonetheless assume, without deciding, that the J.P. investigation did rise to the level of a materially adverse action.

### c. Plaintiff's Reassignment to the District's Middle School

Plaintiff's reassignment for the 2015–16 school year presents a similarly close question. In its March 2017 Order, the Court held that "[a]n action designed to guarantee an employee's failure"—for example, reassigning a teacher to a class for which she lacked certification—"is certainly one that . . . constitutes an adverse employment action." March 2017 Order at 15 (citing Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 90 (2d Cir. 2010) (per curiam)). But Plaintiff herself admitted that she was certified to teach math to special education students. 2015

Pistello Dep. at 80. Furthermore, Plaintiff's bald assertion that she was not certified to teach

reading because "[r]eading is not a special education service," 2018 Pistello Dep. at 23, seems

dubious when considered alongside (1) the contrary assertions made by Lee Farrell—Oneida's

"resident source for information concerning questions about teacher certification," Farrell Aff.

¶ 5—who Plaintiff cited as the basis for her claim regarding the scope of her Special Education

Certification, 2015 Pistello Dep. at 73–74; and (2) the Blodgett Performance Evaluation, which

indicates that Plaintiff taught reading to special education students while employed by the City of

Syracuse during the 2005–06 school year.[31]

Courts in this Circuit have also held, however, that even absent a change in pay or title,

an employee transfer will constitute an adverse action within the context of a Title VII retaliation

claim if "'a reasonable employee would have found the challenged action materially adverse.'"

Williams v. City of New York, No. 99-CV-2697, 2006 WL 2668211, at *21 (E.D.N.Y.

Sept. 11, 2006) (quoting White, 548 U.S. at 68). For example, transfers that result in "less

prestigious" work assignments have been deemed actionable under Title VII. See, e.g., De La

Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 21 (2d Cir. 1996).

Plaintiff claims, referencing "common knowledge" in the District, that her reassignment

to the middle school level would have had just such a negative effect on her employment.

2015 Pistello Dep. at 76–77. Once again, the Court is not entirely convinced by Plaintiff's

assertion, particularly in light of (1) her admission that her duties at the middle school would

---

[31]  Admittedly, Plaintiff did not earn her Special Education Certification until
August 2008, meaning that certification did not apply during her time at Blodgett. But the fact
that Plaintiff had previously taught reading during the course of her special education instruction
lends credence to Superintendent Clarke's claim that "[t]eaching reading in a [s]pecial
[e]ducation classroom[] is fundamental" to special education instruction. Clarke Aff. ¶ 65.

have been essentially the same as at the high school, 2018 Pistello Dep. at 29; and (2) her eventual decision to leave the District in favor of a position teaching middle school students in the City of Syracuse, 2015 Pistello Dep. at 66–67. Moreover, in Lucero v. Nettle Creek School, 566 F.3d 720 (7th Cir. 2009), the Seventh Circuit rejected a claim of material adversity that was very similar to Plaintiff's, finding that a teacher's reassignment from a twelfth grade to a seventh grade class was not a materially adverse employment action because the teacher "was not reassigned to a position consisting of objectively less desirable duties." Id. at 729.

Nonetheless, given the closeness of this question and the alternative grounds for dismissal discussed below, the Court will once again assume, without deciding, that Plaintiff's reassignment constituted a materially adverse action.

### 2. Defendant's Stated Reasons for the Adverse Actions

Proceeding to the second step in the McDonnell Douglas framework, the Court must now determine whether Defendant has "articulate[d] some legitimate, nondiscriminatory reason" for the J.P. investigation and Plaintiff's end-of-year reassignment. McDonnell Douglas, 411 U.S. at 802.

### a. The J.P. Investigation

Neither of Defendant's Memorandum or Reply offer a legitimate, non-retaliatory reason for the J.P. investigation. However, the SMF addresses the J.P. investigation in some detail, stating that J.P. was not "targeted" as Plaintiff claims, because "Defendant is required by law to investigate and address student[s'] complaints under [New York's] Dignity for [A]ll Students Act." SMF ¶ 80; see also N.Y. Educ. Law § 11, *et seq.* That statute requires "[t]he board of education . . . of every school district [to] create policies . . . requir[ing] the principal,

superintendent[,] or the principal's or superintendent's designee to lead or supervise the thorough investigation of all reports of . . . bullying" they receive. N.Y. Educ. Law § 13(1)(d). Therefore, once the unnamed student complained to the District that J.P. had been bullying J.F., SMF ¶ 81; 2015 Pistello Dep. at 110–11, the District claims that it was legally obligated to pursue some sort of investigation, even against Plaintiff's wishes.

The Court can think of no more legitimate reason for initiating the J.P. investigation than a legal mandate, and therefore finds that Defendant has carried its burden and articulated a non-retaliatory reason for that behavior.

### b. Plaintiff's Reassignment to the District's Middle School

In its Memorandum, Defendant claims that Plaintiff's reassignment—which it describes as "usual and customary," Mem. at 23; see also Staff Assignment Changes (listing the thirty staff assignment changes implemented by the District between the 2014–15 and 2015–16 school years)—was implemented in order "to address the needs of [the District's] students," Mem. at 22. The Reply goes one step further, arguing that the motive behind Defendant's behavior was its "need for a well-qualified middle school teacher in [s]pecial [e]ducation classes." Reply at 9 (citing Clarke Aff. ¶ 61 and SMF ¶¶ 20, 29, 33, 34).

The Court finds those reasons to be sufficiently legitimate to carry Defendant's burden at the second stage of the McDonnell Douglas framework.

### 3. Plaintiff's Rebuttal

Accordingly, "the burden shifts back to . . . Plaintiff to establish that but for h[er] protected activities, the District would not have taken adverse action[s] against h[er]." Senese, 330 F. Supp. 3d at 775. As noted above, Plaintiff cannot carry that burden simply by showing

"that retaliation was a 'substantial' or 'motivating' factor" of Defendant's behavior. Vega, 801 F.3d at 90–91. Rather, she must show—"by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non[-]retaliatory reasons for its action," Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013)—"that retaliation was a but-for cause of the adverse action," Senese, 330 F. Supp. 3d at 772 (internal quotation marks and citation omitted).

### a.  The J.P. Investigation

Just like Defendant's Memorandum and Reply, neither Plaintiff's Opposition nor her Sur-Reply explicitly addressed the J.P. investigation. The Court will therefore look to Plaintiff's Response to the SMF, in which she denies all of Defendant's claims regarding the J.P. investigation by citing to (1) "Plaintiff's Complaint ¶¶ 42–44;" and (2) "the Depo[sition] of Clarke [at] p[age] 103[,] where . . . Clarke testified that the allegations against Plaintiff's son were unfounded." Resp. SMF ¶¶ 80–85, 88. Generously construing those cited-to materials, the Court interprets Plaintiff as arguing that Defendant's stated reason for the J.P. investigation was pretextual because (1) the investigation was conducted "without Plaintiff's knowledge or consent," Compl. ¶ 42; (2) the allegations lodged against J.P. were determined to be "unfounded," id. ¶ 43; Clarke Dep. at 103; and (3) the entire investigation "was just another false allegation and another attempt to target Plaintiff through her son [in an] unwarranted and outrageous" manner, Compl. ¶ 44.

None of those arguments are sufficient to create a genuine dispute of material fact as to whether Plaintiff's Harassment Report was a but-for cause of the J.P. investigation. New York's Dignity for All Students Act required school administrators to perform a "thorough

investigation" of all bullying complaints with or without the consent of the student's parents, and the statute does not provide a safe harbor for administrators to avoid that investigation requirement when they believe a complaint to be baseless or untrue. N.Y. Educ. Law § 13(1)(d). Therefore, the "unfounded" nature of the allegations underlying the unnamed student's complaint—though possibly suggestive of the unnamed student's motive in bringing the complaint—say nothing about Mitchell's motive in investigating it. Furthermore, none of the materials in the record indicate, for example, that similar complaints against other students either went uninvestigated or were subject to less stringent scrutiny. And, though the investigation did occur within a few months of Plaintiff's Harassment Report, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." Kwan, 737 F.3d at 847 (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam)).

The Court therefore finds that Plaintiff has not carried her burden at the pretext stage with regard to the J.P. investigation.

### b.  Plaintiff's Reassignment to the District's Middle School

To rebut Defendant's stated reasons for her reassignment, Plaintiff relies solely on the temporal proximity between her Harassment Report and the reassignment, which she characterizes as "sufficiently short to infer a relationship in the context of a motion for judgment on the pleadings." Opp'n at 27–28 (citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)). However, as the Court already noted, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." Kwan, 737 F.3d at 847 (citation omitted).

That does not mean, however, that the approximately four months between the Harassment Report and Plaintiff's reassignment cannot be considered by the Court. Indeed, the

Second Circuit has made clear that "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence . . . to defeat summary judgment at [the pretext] stage." Id. (citing Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001)). Therefore, the Court will also examine the arguments Plaintiff raised in stating her prima facie case, to see whether they lend support to Plaintiff's claim that the reassignment "'would not have occurred in the absence of [Defendant's] retaliatory motive.'" Opp'n at 28 (quoting Kwan, 737 F.3d at 846).

First, Plaintiff rejects Defendant's characterization of the typicalness of Plaintiff's reassignment, noting that "Plaintiff was the only teacher reassigned [between the 2014–15 and 2015–16 school years] from the [h]igh [s]chool to the [m]iddle [s]chool and was the only teacher reassigned from teaching English to teaching [m]ath and [r]eading." Opp'n at 26. But during her 2018 deposition, Plaintiff expressly agreed that a teacher's "year to year . . . assignments are likely to change[] depending on the needs of the District." 2018 Pistello Dep. at 19. In addition, the Staff Assignment Changes document submitted by Defendant indicates, contrary to Plaintiff's representations, that four other teachers—including one other special education teacher—were reassigned from the high school to the middle school prior to the 2015–16 school year. Staff Assignment Changes at 60–62. Although inter-subject area reassignments appeared to have been less common that summer, they too were not completely unheard of. See id. (listing the following inter-subject area reassignments: (1) Kelley Brenon reassigned from creative writing to academic intervention services; (2) Glenn Phillips reassigned from English to academic intervention services; and (3) Jeannie Garrisi reassigned from chemistry to living environment). Finally, the Court finds that the record largely supports Defendant's position that Plaintiff's reassignment

occurred not due to any retaliatory motive, but because the District "need[ed] a well-qualified middle school teacher." Reply at 9 (citations omitted); see also 2018 Pistello Dep. at 37 (including Plaintiff's admission that she had prior experience teaching at the middle school level); id. at 81 (including Plaintiff's testimony about being asked to grade middle school-level state exams during the 2013–14 school year).

Second, Plaintiff argues that, though she was "certified in [s]pecial [e]ducation K–12, . . . her primary experience as a teacher at the District was as a [h]igh [s]chool [English Language Arts] teacher . . . and she had never taught middle school math before." Opp'n at 15. However, the fact that Plaintiff had a strong background teaching high school students does not undermine the District's stated need for strong, qualified teachers at the middle school level. Reply at 9. Also, though technically true, Plaintiff's claim that she had never taught middle school math is somewhat misleading. Plaintiff had taught before at the middle school level, and had even taught math in the District during the 2009–10 school year, albeit for high school students. 2018 Pistello Dep. at 17–18, 37. In any event, the District eventually removed Plaintiff's math-based responsibilities at her own request. Id. at 32.

Third, Plaintiff stated during her 2018 deposition that "if you are sent down to the middle school, it's usually because you cannot do something right in the high school." 2015 Pistello Dep. at 76–77. On the one hand, that observation would not, on its face, undermine Defendant's claim that it reassigned Plaintiff in order to better address the needs of its students. Mem. at 22. If Plaintiff could truly provide stronger instruction at the middle school level, then her reassignment could be justified as maximizing the educational benefit to the District's students.

On the other hand, Plaintiff's comment could plausibly be interpreted to mean that her reassignment resulted in negative reputational effects, because it left her colleagues with the impression that she was an ineffective high school teacher. However, that argument does not squarely address any "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's proffered rationale for the reassignment. Kwan, 737 F.3d at 846. Instead, it offers a competing rationale for Defendant's behavior; one that Plaintiff supports solely through her tenuous references to the "common knowledge" in the District and some conversations she had with her colleagues. 2015 Pistello Dep. at 76–77. At most, Plaintiff's argument creates a "weak issue of fact as to whether [Defendant's] reason was untrue," and it therefore cannot overcome "abundant and uncontroverted evidence" that Defendant routinely reassigned teachers to different roles depending on the needs of the District and its students. Reeves, 530 U.S. at 148. Therefore, even considered alongside the reassignment's temporal proximity to Plaintiff's Harassment Report, the Court finds that argument insufficient to carry Plaintiff's burden "to bring forward some evidence of pretext." El Sayed, 627 F.3d at 933.

Accordingly, based on the foregoing analysis, the Court grants Defendant's Motion as to Plaintiff's Title VII retaliation claim, which is dismissed in its entirety.

**B. Plaintiff's ADA and RA Claims**

*1. Retaliation*

As the Court already explained in the March 2017 Order, the ADA and the RA "impose identical requirements for assessing retaliation claims and therefore can be evaluated simultaneously." March 2017 Order at 16 (citing Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999)). The Court also noted that "'the framework used in analyzing retaliation

claims under Title VII [should also be used] in analyzing a claim of retaliation under the ADA.'" Id. at 16–17 (alteration in original) (quoting Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)).

Therefore, the Court's Title VII analysis, see supra Part IV.A, applies equally to Plaintiff's ADA and RA claims insofar as they are premised on the Second Professional Conduct Meeting, the Fourth Professional Conduct Memorandum, the 2015 APPR, the J.P. investigation, and/or Plaintiff's 2015–16 teaching reassignment. However, because the protected activity underlying Plaintiff's ADA and RA claims—the November 2014 Email, see March 2017 Order at 17–19—occurred on November 6, 2014, the Court must also analyze Plaintiff's ADA/RA claims with reference to all of the adverse actions alleged to have occurred after that date. Those additional actions include: (1) Plaintiff's removal from the Regents Exam scoring process; (2) the December 2014 Rose Email; (3) the First, Second, and Third Professional Conduct Memoranda; (4) the First Professional Conduct Meeting; and (5) the Counseling Memorandum.

### a. Plaintiff's Prima Facie Case—Materially Adverse Action

#### i. Regents Exam Scoring

The parties agree that the administration's decision to prohibit Plaintiff from scoring the January 2015 Regents Exams did not affect Plaintiff's salary or benefits. 2018 Pistello Dep. at 88–89; Resp. SMF ¶ 57. However, Plaintiff's non-participation meant she would no longer be available in case "there was some sort of discre[pancy] about what [one of her students] w[as] trying to say." 2018 Pistello Dep. at 82–83. As a result, the exam scores of Plaintiff's students could have suffered, which in turn may have led to a drop in Plaintiff's performance evaluations and, eventually, her termination. 2015 Pistello Dep. at 78 ("If you get two [negative performance

reviews] in a three-year period, you're done."). Furthermore, Plaintiff could persuasively argue that the administration's decision reduced her duties in a manner that curtailed opportunities for professional growth, since participation in the grading process likely deepened Plaintiff's knowledge and understanding of the state's academic standards.

Once again, the question of whether Plaintiff's exclusion from the Regents Exam scoring process constituted a materially adverse action is a close one.

While existential threats to a complainant's career can qualify as materially adverse, Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) ("Examples of materially adverse employment actions include termination of employment." (internal quotation marks and citation omitted)), the Court has several misgivings over applying that logic to the Regents Exam decision. The link between Plaintiff's scoring of Regents Exams and her potential termination is both hypothetical and attenuated; it would require the Court to assume that Plaintiff's students would receive failing scores if Plaintiff was unavailable to interpret their papers, and that those scores would further result in Plaintiff receiving two negative evaluations over the course of a three-year period. Furthermore, in applying Feingold's termination logic to the Regents Exam decision, the Court would be tacitly supporting the position that an instructor must be allowed to participate in the scoring of standardized state-level exams solely in order to secure her pupils' (and, by extension, her own) success. The Court is not inclined to do so.

As to the effect of the administration's decision on Plaintiff's professional growth, multiple courts in this Circuit have found that "significantly diminished material responsibilities" can constitute a materially adverse action under certain circumstances. See, e.g., Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 434 (E.D.N.Y. 2015). But it is not clear,

based on the record, that Plaintiff's exclusion from the grading process would have actually resulted in a diminishment of her responsibilities, much less one that could be described as "significant." The Regents Exam scoring process was completely voluntary, 2018 Pistello Dep. at 88–89, and therefore arguably did not qualify as one of Plaintiff's "responsibilities." Moreover, Plaintiff had previously graded Regents Exams on numerous occasions, id. at 80–81, making it unclear how much additional insight and professional experience Plaintiff would have gained based on her continued participation in that process.

Given the closeness of this question, the Court is hesitant to definitively decide whether the evidence supports Plaintiff's prima facie case. However, since alternative grounds exist for dismissing Plaintiff's scoring-related retaliation claim, the Court will once again assume, without deciding, that the Regents Exam scoring decision rose to the level of a materially adverse action.

### ii. The First, Second, and Third Professional Conduct Memoranda, the First Professional Conduct Meeting, the Counseling Memorandum, and the December 2014 Rose Email

The First Professional Conduct Memorandum, the First Professional Conduct Meeting, and the Counseling Memorandum all arose out of Plaintiff's January 23, 2015 meeting with Principal Mecca, in which she and Plaintiff discussed the proper scoring of a student's exam. Revised Counseling Mem. Similarly, the Second and Third Professional Conduct Memoranda called Plaintiff to the Second Professional Conduct Meeting to discuss Plaintiff's handling of the D.J. incident. And the December 2014 Rose Email criticized Plaintiff for "fail[ing] to inform [Rose] of the eleventh grade English scheduling issue in a timely manner," and directed Plaintiff to bring to Rose's immediate attention "any issues involving IEPs[] or with special education students," or else risk "formal administrative action." Dec. 2014 Rose Email.

Thus, all of those events arose out of seemingly legitimate concerns surrounding Plaintiff's performance in her role as an employee of the District, and could (at most) be characterized as reprimands for Plaintiff's perceived professional failings. None resulted in a demotion or reduction in Plaintiff's pay, and only the Revised Counseling Memorandum found its way permanently into Plaintiff's personnel file. See Uddin, 427 F. Supp. 2d at 429 ("[C]ourts in this [C]ircuit have found that reprimands, threats of disciplinary action[,] and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."). Therefore, much like the Second Professional Conduct Meeting and Fourth Professional Conduct Memorandum, see supra Part IV.A.1.a, the First, Second, and Third Professional Conduct Memoranda, the First Professional Conduct Meeting, the Counseling Memorandum, and the December 2014 Rose Email are all best described as "criticism" that was "necessary to allow [Plaintiff to develop, improve[,] and avoid discipline," rather than as materially adverse actions. Weeks, 273 F.3d at 86; see also Boyle v. Lynch, 5 F. Supp. 3d 425, 438–39 (W.D.N.Y. 2014) (citing Weeks in dismissing ADA retaliation claim based on issuance of a memorandum "reminding [plaintiff] of his duties and obligations," when memorandum "was not accompanied by any demotion or decrease in pay"); Smiley v. Cassano, No. 10-CV-3866, 2012 WL 967436, at *7–8 (S.D.N.Y. Mar. 21, 2102) (finding that post-complaint investigations and critiques of plaintiff's professional conduct could not give rise to ADA retaliation claim because they "f[e]ll within the category of criticisms that are inherent and necessary parts of employee development within the workplace").

The Court therefore finds that Plaintiff cannot maintain actionable ADA or RA claims based solely on any of the First, Second, or Third Professional Conduct Memoranda, the First Professional Conduct Meeting, the Counseling Memorandum, or the December 2014 Rose Email.

### iii.  The Aggregated Actions

As already noted above, the Court must also evaluate whether all of the actions that occurred during the relevant time period—including the December 2014 Rose Email, the First, Second, Third, and Fourth Professional Conduct Memoranda, the First and Second Professional Conduct Meetings, the Counseling Memorandum, and the 2015 APPR (collectively, the "Aggregated Actions")[32]—since "in the aggregate as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." Hicks, 593 F.3d at 165 (internal quotation marks and citation omitted). However, the Second Circuit has cautioned with regard to aggregated acts of retaliation that "'[z]ero plus zero is [still] zero.'" Tepperwien, 663 F.3d at 572 (quoting MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir. 1998)). In other words, "it is simply not true . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent." Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 763 (7th Cir. 2001).

The Court finds that the compounded effect of the Aggregated Actions still does not constitute a materially adverse action sufficient to support an ADA retaliation claim. True, all of

---

[32]  Since the Court has already determined that Defendant had legitimate, non-retaliatory reasons for the J.P investigation and Plaintiff's end-of-year teaching reassignment, it has not included them in the list of Aggregated Actions and need not consider them when evaluating the compounded effect of Plaintiff's allegations.

the Aggregated Actions occurred within six months of Plaintiff's November 2014 Email, and all but one fell within a single three-month period. And, at least with regard to the Professional Conduct Memoranda, Vice Principal Rogers confirmed that the occurrence of so many remarkable events during such an abbreviated time period was not common. Rogers Dep. at 30–31.

However, the Court has already determined that only one of the Aggregated Actions resulted in a permanent disciplinary act—namely, the placement of the Revised Counseling Memorandum into Plaintiff's personnel file. All of the form-document Professional Conduct Memoranda were removed from Plaintiff's file, her 2015 APPR was eventually scored as "highly effective" (the highest available rating), and, though the December 2014 Rose Email threatened disciplinary action if Plaintiff continued to engage in certain behavior, no warning was placed in Plaintiff's file and no disciplinary action was taken.

Also, besides the proximity of the Aggregated Actions to the November 2014 Email, the record provides no other evidence indicating that those actions were retaliatory in nature. They were separately undertaken by three different District employees—Rose, Mecca, and Rogers—none of whom ever specifically expressed any retaliatory sentiments to Plaintiff. Moreover, the parties do not dispute the basic factual circumstances surrounding the events that led to the Aggregated Actions (i.e., the eleventh grade English scheduling issue, the January 23, 2015 meeting between Plaintiff and Mecca, the February 4, 2015 meeting between Plaintiff and Rogers, and the 2015 APPR), even though they have very different interpretations of their importance. See, e.g., 2018 Pistello Dep. at 89–94 (claiming that "some [of the] things in [the Revised Counseling Memorandum] still weren't true," but mirroring the Revised Counseling

Memorandum's depiction of the factual circumstances underlying Plaintiff's January 23, 2015 meeting with Mecca). Those agreed-upon factual circumstances, considered within the context of Plaintiff's broader case, make clear that the Aggregated Actions were not undertaken for retaliatory reasons.

Finally, though the test is an objective one, the Court nonetheless finds it relevant that Plaintiff was not *actually* deterred from complaining following the November 2014 Email. See Tepperwien, 663 F.3d at 572 (considering, within the context of a retaliation aggregation analysis, a plaintiff's tendency to continue complaining following alleged adverse actions, even though "the [relevant] test is an objective one"). On the contrary, Plaintiff immediately sent a barbed reply to the November 2014 Email, copying in nearly all of the District's administrators, in which she accused Rose of "threaten[ing her]" and "try[ing] to label [her] an insubordinate worker." Dec. 2014 Pistello Email. And later, Plaintiff also complained—both on her own and with the assistance of her union representative and attorney—by (1) objecting to the contents of the Counseling Memorandum; (2) filing the Harassment Report; (3) challenging the contents of her 2015 APPR; and (4) requesting a change in her 2015–16 teaching assignment.

The Court therefore finds that, considering all of the relevant context, the Aggregated Actions "still did not adversely affect [Plaintiff] in any material way," because "[z]ero plus zero is [still] zero." Tepperwien, 242 F.3d at 572 (internal quotation marks and citation omitted); see also Szwalla v. Time Warner Cable, LLC, 135 F. Supp. 3d 34, 53–54 (N.D.N.Y. 2015) (declining to find that an adverse action arose out of the compounded effect of (1) plaintiff's reassignment to remote managers; (2) a stagnation in her job duties; (3) written warnings for plaintiff's

"undisputed poor sales performance" unaccompanied by further disciplinary action; and (4) her employer's refusal to create an "inside sales position" in plaintiff's desired geographic location).

Therefore, insofar as Plaintiff's ADA/RA retaliation claims are based off the Aggregated Actions, those claims fail as a matter of law.

### b. Defendant's Stated Reason for the Regents Exam Scoring Decision

Defendant claims that its January 2015 decision "not to have individuals not certified in English[—]such as Plaintiff[—]grade English Regents Examinations" "was a general decision and not one directed at Plaintiff." Reply at 7; Mem at 8. That accords with Superintendent Clarke's testimony, which implied that all of the academic departments in the District implemented that change simultaneously, with the result being that only "teachers that were certified in [a given subject] area" were allowed to score Regents Exams in that subject. Clarke Dep. at 45.

The Court finds Defendant's stated reason sufficiently legitimate to carry Defendant's burden at the second stage of the McDonnell Douglas framework.

### c. Plaintiff's Rebuttal

Plaintiff devotes very little attention to the Regents Exam scoring decision in her briefing, arguing only that Defendant's stated reason is pretextual because (1) there existed temporal proximity between the decision and Plaintiff's protected activity; and (2) Plaintiff had graded Regents Exams in the past. See Opp'n at 9 ("Shortly []after [the November 2014 Email], Plaintiff was informed that she would not be one of the graders for the English Regents [E]xam, even though she had been a grader for many years and normally taught the review class." (citing Compl. ¶¶ 27–28 and 2018 Pistello Dep. at 81, 110–11)).

The Court finds those arguments unavailing. Without more, temporal proximity is insufficient to carry Plaintiff's burden at the pretext stage. Hicks, 593 F.3d at 164. And Plaintiff's past participation in the grading process in no way undermines Defendant's stated rationale; Defendant's decision was geared towards ensuring that all graders were formally certified in a given subject area, not in maximizing the experience they brought to the grading process. Plaintiff may have more convincingly argued that she was the only teacher negatively affected by the District's decision, such that the decision was actually intended to target her regardless of Defendant's representation that it was implemented District-wide. However, Plaintiff does not make, and the record does not support, such a claim.

The Court therefore finds that Plaintiff's ADA/RA retaliation claim cannot survive Defendant's Motion and must be dismissed.

### 2. Retaliatory Hostile Work Environment

"ADA hostile work environment claims are evaluated under the same standard as Title VII." March 2017 Order at 21 (citing Zavala v. Cornell Univ., 9 F. Supp. 3d 213, 220 (N.D.N.Y. 2014 (Kahn, J.). Therefore, to establish a claim based on a retaliatory hostile work environment under the ADA, "a plaintiff must satisfy the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct." Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 438 (E.D.N.Y. 2009). That standard requires a plaintiff to show "that the discriminatory treatment at issue was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment' and that the

hostility occurred because of the protected characteristic of disability."[33] Dollinger v. N.Y. State Ins. Fund, 726 F. App'x 828, 831 (2d Cir. 2018) (quoting Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)).

Applying that standard to the undisputed facts of this case leaves no doubt that Plaintiff's retaliatory hostile work environment claim must be dismissed. The Court has already found that Defendant provided legitimate, non-retaliatory, and unrebutted reasons for the Regents Exam scoring decision, see supra Parts IV.B.1.b and IV.B.1.c, the J.P. investigation, see supra Parts IV.A.2.a and IV.A.3.a, and Plaintiff's 2015–16 teaching reassignment, see supra Parts IV.A.2.b and IV.A.3.b. Those legitimate rationales preclude Plaintiff from arguing that any of those three actions "occurred because of the protected characteristic of disability." Dollinger, 726 F. App'x at 831. Furthermore, even assuming that all of the Aggregated Actions occurred in response to Plaintiff's advocacy on behalf of her disabled students, the Court has already determined that those actions considered collectively are insufficient to state a materially adverse

---

[33] Following the Supreme Court's decision in White, several courts in this Circuit have questioned whether "a plaintiff could establish a *prima facie* case for retaliatory hostile work environment via a materially adverse action, as would apply to a retaliation claim, rather than an adverse employment action, as would normally apply in a hostile work environment claim." Bacchus v. N.Y.C. Dep't of Educ., 137 F. Supp. 3d 214, 244 n.22 (E.D.N.Y. 2015) (internal quotation marks omitted). "In other words, the question was raised whether plaintiffs attempting to show a retaliatory hostile work environment could potentially survive summary judgment by showing that they were subjected to conduct, which although objectionable enough that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination, did not meet the severe or pervasive threshold ordinarily required in hostile work environment claims." Matthews v. Corning Inc., 77 F. Supp. 3d 275, 297 n.7 (W.D.N.Y. 2014) (internal quotation marks and citation omitted). The vast majority, with which the Court agrees, have answered that question in the negative, reasoning that the Supreme Court "provided no indication in White that it intended to expand the reach of the judicially-created claim of retaliatory hostile work environment in addition to lowering the burden of making out a claim based on the retaliatory acts of an employer." Cajamarca v. Regal Entm't Grp., 863 F. Supp. 2d 237, 254 (E.D.N.Y. 2012).

action, see supra Part IV.B.1.b., much less that they could have created a sufficiently severe or pervasive work environment, see Cajamarca, 863 F. Supp. 2d at 254 (describing the retaliation standard as less burdensome than the hostile work environment standard); Bacchus, 137 F. Supp. 3d at 244 n.22 (same); Matthews, 77 F. Supp. 3d at 296–298, 297 n.7 (same).

The Court will therefore grant Defendant's Motion and dismiss Plaintiff's retaliatory hostile work environment claim.

### 3. Constructive Termination

Although not mentioned in the March 2017 Order, Plaintiff also appears to argue in her Complaint that she was constructively terminated from the District,[34] see Compl. ¶ 65 ("The hostile work environment created by the District's retaliation forced Plaintiff to resign, amounting to constructive discharge."), and both Plaintiff's and Defendant's papers address such a claim, see Mem. at 25–27; Opp'n at 29.

It is well settled that "[a]n adverse employment action may also take the form of a constructive discharge." Caskey v. Cty. of Ontario, 560 F. App'x 57, 59 (2d Cir. 2014); see also Adams v. Festival Fun Parks, LLC, 560 F. App'x 47, 49 (2d Cir. 2014) (same); Giambattista v. Am. Airlines, Inc., 5 F. Supp. 3d 284, 292 (E.D.N.Y. 2014) (same). A constructive occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Morris v. Schroder

_____

[34] Plaintiff does not clarify whether she intends her constructive discharge allegation to state a standalone ADA/RA claim, see Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73–75 (2d Cir. 2000), or to act as separate proof that she suffered an adverse action, see Adamas v. Festival Fun Parks, LLC, 560 F. App'x 47, 49 (2d Cir. 2014) ("A plaintiff can . . . meet th[e adverse action] prong if [s]he was constructively discharged."). But for the purposes of the Court's analysis, that distinction is immaterial.

Capital Mgmt. Int'l, 481 F.3d 86, 88 (2d Cir. 2007) (internal quotation marks omitted). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Serricchio v. Wachovia Sec. LLC, 658 F.3d 169, 185 (2d Cir. 2011). In this District, that means "that to demonstrate constructive discharge, [a] plaintiff must demonstrate harassment that is more severe and pervasive than that required to show a hostile work environment." Ternullo v. Reno, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998) (citing Christopher-Ketchum v. Agway Energy Prods., 988 F. Supp. 610 (N.D.N.Y. 1997)).

Accordingly, since the Court has already determined that Plaintiff cannot maintain her claims against Defendant under a hostile work environment, retaliation, or retaliatory hostile work environment theory, any constructive discharge claim purportedly stated in the Complaint must also fail.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 36) is **GRANTED in its entirety**; and it is further

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk is directed to close this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 21, 2019
                Albany, New York

Lawrence E. Kahn
U.S. District Judge